**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | | |
|---|---|---|
| Beau John Greene, | ) | No. CV-03-605-TUC-FRZ |
| Petitioner, | ) ) | <u>DEATH  PENALTY CASE</u> |
| vs. | ) ) | |
| Charles L. Ryan, et al.,[1] | ) ) | **MEMORANDUM OF DECISION AND ORDER** |
| Respondents. | ) ) | |

Petitioner Beau John Greene, a state prisoner under sentence of death, has filed an Amended Petition for Writ of Habeas Corpus. (Dkt. 82.)[2] Petitioner alleges, pursuant to 28 U.S.C. § 2254, that he is imprisoned and sentenced in violation of the United States Constitution.  In a previous order, the Court denied Petitioner's request for evidentiary development and dismissed Claims 1, 2, 3, 4-A (in part), 4-C (in part), 5, 6-A, 6-B (in part), 6-C, 7-B, 8, and 12 based on a procedural bar; Claim 9 as not cognizable; Claims 7-A, 7-C, and 10 on the merits as a matter of law; and Claim 11 without prejudice as premature. (Dkt. 86.)  Two claims, one with several subclaims, remain.  For the reasons set forth herein, the Court finds that Petitioner is not entitled to habeas relief.

## BACKGROUND

Petitioner was convicted and sentenced to death for the murder of Roy Johnson, a

---

[1]     Charles L. Ryan, Interim Director of the Arizona Department of Corrections, is substituted for his predecessor pursuant to Fed. R. Civ. P. 25(d)(1).

[2]     "Dkt." refers to the documents in this Court's case file.

music professor at the University of Arizona in Tucson. The following recitation of the facts surrounding the crime is based on the decision of the Arizona Supreme Court affirming Petitioner's murder conviction and death sentence, *State v. Greene*, 192 Ariz. 431, 967 P.2d 106 (1998), and this Court's review of the record.

Roy Johnson was last seen around 9:30 p.m. on February 28, 1995, leaving a church where he had just given an organ recital. Although his wife expected him home before 10:00 p.m., Johnson did not return. Four days later, authorities found his body lying face down in a wash. Petitioner admitted at trial that he killed Johnson.

On the day of the murder, Petitioner's friends, Tom Bevan and Loriann Verner, told Petitioner he could no longer stay in their trailer outside of Tucson. A drug dealer had threatened to shoot Petitioner over an outstanding debt, and Bevan and Verner feared that Petitioner's presence in their trailer would ruin their relationship with the dealer. Petitioner stole a truck and drove to Tucson where the truck broke down. Sometime that night, during Johnson's drive home from the concert, he and Petitioner crossed paths.

Petitioner testified that he had been using methamphetamine continuously for several days and was suffering from withdrawal. He was resting in a park when Johnson stopped his car and approached him. According to Petitioner, Johnson wanted to perform oral sex on him and offered to pay for it. Petitioner accepted, and the two drove to a secluded parking lot in Johnson's car. Petitioner testified that he changed his mind and told Johnson that he would not follow through. In response, Johnson purportedly smiled and touched Petitioner's leg. At that point, Petitioner "freaked out" and impulsively struck Johnson several times in the head with his fist. He moved Johnson's body to the back of the car, drove to a wash, and dumped the body. He walked back to the car and drove away. According to Petitioner, he then realized he needed money so he returned to the wash, walked down to the body, and stole Johnson's wallet.

The trial evidence undermined Petitioner's version of the killing. First, and most significantly, medical testimony indicated that the damage to the victim's skull was inflicted

by a heavy flat object, not, as Petitioner testified, by a fist. The bones of a fist striking a person's head will shatter before the thick bones of the skull, and Petitioner's hands were not injured. Second, only one set of tire tracks and footprints entered and left the wash where the body was found, suggesting that Petitioner did not return for the wallet but had it with him when he left immediately after the murder. Third, Petitioner told Bevan he beat someone to death with a club.

After dumping the body, Petitioner drove Johnson's car directly to the Bevan/Verner trailer, where he told Bevan about the killing. Petitioner asked Bevan for some clean shoes. He also took a rug to cover the bloody car seats.

Petitioner left the trailer and headed for K-mart, the first of several stops he made on a shopping spree using the victim's cash and credit cards. To explain the discrepancy between his signature and those on the credit cards, Petitioner wrapped his hand with K-Y jelly and gauze to simulate a burn injury. He bought clothes, food, camping gear, a scope and air rifle, car cleaner, and a VCR, which he later traded for methamphetamine.[3] He eventually abandoned Johnson's car in the desert. Several days later, the police arrested Petitioner at a friend's house.

The jury convicted Petitioner of kidnapping, robbery, and first-degree murder. Pima County Superior Court Judge Bernardo P. Velasco sentenced Petitioner to death for the murder and terms of imprisonment for the other counts.[4] On direct appeal, the Arizona Supreme Court reversed the kidnapping conviction but otherwise affirmed. *State v. Greene*, 192 Ariz. 431, 967 P.2d 106 (1998). A petition for certiorari to the United States Supreme

---

[3] He also stopped at an adult bookstore where he purchased a sex toy. (RT 3/13/96 at 109-10, 182.)

[4] At the time of Petitioner's trial, Arizona law required trial judges to make all factual findings relevant to capital punishment and to determine sentence. Following the Supreme Court's decision in *Ring v. Arizona*, 536 U.S. 584 (2002), which held that a jury must determine the existence of facts rendering a defendant eligible for capital punishment, Arizona's sentencing scheme was amended to provide for jury determination of eligibility factors, mitigating circumstances, and sentence.

Court was denied in May 1999.  *Greene v. Arizona*, 526 U.S. 1120 (1999).

Petitioner filed a petition for post-conviction relief (PCR) pursuant to Rule 32 of the Arizona Rules of Criminal Procedure on August 18, 2000, and an amended petition in December 2001.  Following an evidentiary hearing, the PCR court denied relief in January 2003.[5]  On December 4, 2003, the Arizona Supreme Court summarily denied a petition for review.  Thereafter, Petitioner initiated the instant habeas proceedings.

## APPLICABLE LAW

Because it was filed after April 24, 1996, this case is governed by the Antiterrorism and Effective Death Penalty Act of 1996, 28 U.S.C. § 2254 (AEDPA).  *Lindh v. Murphy*, 521 U.S. 320, 336 (1997); *see also Woodford v. Garceau*, 538 U.S. 202, 210 (2003).

For properly exhausted claims, the AEDPA established a "substantially higher threshold for habeas relief" with the "acknowledged purpose of 'reducing delays in the execution of state and federal criminal sentences.'" *Schriro v. Landrigan*, 550 U.S. 465, 475 (2007) (quoting *Woodford v. Garceau*, 538 U.S. 202, 206 (2003)).  The AEDPA's "'highly deferential standard for evaluating state-court rulings' . . . demands that state-court decisions be given the benefit of the doubt." *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam) (quoting *Lindh v. Murphy*, 521 U.S. 320, 333 n.7 (1997)).

Under the AEDPA, a petitioner is not entitled to habeas relief on any claim "adjudicated on the merits" by the state court unless that adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).  The relevant state court decision is the last reasoned state decision

---

[5]     During PCR proceedings in this matter, Judge Velasco left the Pima County bench to assume a position as a United States Magistrate Judge for the District of Arizona. Pima County Superior Court Judge Jane L. Eikleberry presided over the evidentiary hearing and ruled on the PCR petition.

regarding a claim. *Barker v. Fleming*, 423 F.3d 1085, 1091 (9th Cir. 2005) (citing *Ylst v. Nunnemaker*, 501 U.S. 797, 803-04 (1991)).

"The threshold question under AEDPA is whether [a petitioner] seeks to apply a rule of law that was clearly established at the time his state-court conviction became final." *Williams v. Taylor*, 529 U.S. 362, 390 (2000). Therefore, to assess a claim under subsection (d)(1), the Court must first identify the "clearly established Federal law," if any, that governs the sufficiency of the claims on habeas review. "Clearly established" federal law consists of the holdings of the Supreme Court at the time the petitioner's state court conviction became final. *Williams*, 529 U.S. at 365; *see Carey v. Musladin*, 549 U.S. 70, 76 (2006). Habeas relief cannot be granted if the Supreme Court has not "broken sufficient legal ground" on a constitutional principle advanced by a petitioner, even if lower federal courts have decided the issue. *Williams*, 529 U.S. at 381; *see Musladin*, 549 U.S. at 77. Nevertheless, while only Supreme Court authority is binding, circuit court precedent may be "persuasive" in determining what law is clearly established and whether a state court applied that law unreasonably. *Clark v. Murphy*, 331 F.3d 1062, 1069 (9th Cir. 2003).

The Supreme Court has provided guidance in applying each prong of § 2254(d)(1). The Court has explained that a state court decision is "contrary to" the Supreme Court's clearly established precedents if the decision applies a rule that contradicts the governing law set forth in those precedents, thereby reaching a conclusion opposite to that reached by the Supreme Court on a matter of law, or if it confronts a set of facts that is materially indistinguishable from a decision of the Supreme Court, but reaches a different result. *Williams*, 529 U.S. at 405-06; *see Early v. Packer,* 537 U.S. 3, 8 (2002) (per curiam). In characterizing the claims subject to analysis under the "contrary to" prong, the Court has observed that "a run-of-the-mill state-court decision applying the correct legal rule to the facts of the prisoner's case would not fit comfortably within § 2254(d)(1)'s 'contrary to' clause." *Williams*, 529 U.S. at 406.

Under the "unreasonable application" prong of § 2254(d)(1), a federal habeas court

may grant relief where a state court "identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular . . . case" or "unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Williams*, 529 U.S. at 407. For a federal court to find a state court's application of Supreme Court precedent "unreasonable" under § 2254(d)(1), the petitioner must show that the state court's decision was not merely incorrect or erroneous, but "objectively unreasonable." *Id.* at 409; *Visciotti*, 537 U.S. at 25.

Under the standard set forth in § 2254(d)(2), habeas relief is available only if the state court decision was based on an unreasonable determination of the facts. *Miller-El v. Dretke*, 545 U.S. 231, 240 (2005) (*Miller-El II*). A state court decision "based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *Miller-El I*, 537 U.S. at 340; *see Taylor v. Maddox*, 366 F.3d 992, 999 (9th Cir. 2004). In considering a challenge under 2254(d)(2), state court factual determinations are presumed to be correct, and a petitioner bears the "burden of rebutting this presumption by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *Miller-El II*, 545 U.S. at 240.

## DISCUSSION

**Claim 4**: **Ineffective Assistance of Counsel**

Petitioner alleges that trial counsel performed ineffectively by calling him as a witness and advising him to testify untruthfully (Claim 4-A); by failing to file a motion to vacate the judgment after two witnesses came forward to support Petitioner's defense (4-B); and by failing to present expert evidence in mitigation at sentencing (4-C(3)).

Clearly established federal law

Claims of ineffective assistance of counsel are governed by the principles set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). To prevail under *Strickland*, a petitioner must show that counsel's representation fell below an objective standard of reasonableness

- 6 -

and that the deficiency prejudiced the defense. *Id.* at 687-88.

The inquiry under *Strickland* is highly deferential, and "every effort [must] be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 689; *see Wong v. Belmontes*, --- U.S. ----, 130 S. Ct. 383, 384 (2009) (per curiam); *Bobby v. Van Hook*, --- U.S. ----, 130 S. Ct. 13, 16 (2009) (per curiam). Thus, to satisfy *Strickland*'s first prong, a defendant must overcome "the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.* "The test has nothing to do with what the best lawyers would have done. Nor is the test even what most good lawyers would have done. We ask only whether some reasonable lawyer at the trial could have acted, in the circumstances, as defense counsel acted at trial." *Id.* at 687-88.

With respect to *Strickland*'s second prong, a petitioner must affirmatively prove prejudice by "show[ing] that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

Because an ineffective assistance of counsel claim must satisfy both prongs of *Strickland*, the reviewing court "need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies." *Id.* at 697 ("if it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed").

Under the AEDPA, this Court's review of the state court's decision is subject to another level of deference. *Bell v. Cone*, 535 U.S. 685, 698-99 (2002); *see Knowles v. Mirzayance*, 129 S. Ct. 1411, 1420 (2009) (noting that a "doubly deferential" standard applies to *Strickland* claims under the AEDPA). Therefore, to prevail on this claim, Petitioner must make the additional showing that the state court, in ruling that counsel was not ineffective, applied *Strickland* in an objectively unreasonable manner. 28 U.S.C. §

1  2254(d)(1).

2      Claim 4-A

3      Petitioner alleges that counsel performed ineffectively by presenting his testimony and

4  advising him to testify untruthfully regarding the manner in which he killed the victim. (Dkt.

5  82 at 72-76.) Petitioner contends that this element of counsel's performance prejudiced him

6  at both the guilt and sentencing stages of trial.[6]

7      *Background*

8      At trial and sentencing Petitioner was represented by Jill Thorpe and David Darby,

9  with Darby as lead counsel. (RT 9/9/02 at 12, 17.)[7] Thorpe was primarily responsible for

10 the sentencing stage of trial. (*Id.* at 12.) A third attorney, Julie Duval, also assisted the

11 defense. (*Id.* at 86-87.)

12     Petitioner raised claims of ineffective assistance of counsel in his PCR petition. The

13 court held an evidentiary hearing. Petitioner's trial counsel testified, along with a *Strickland*

14 expert. Petitioner also testified.

15     At the hearing, Thorpe testified that prior to his trial testimony Petitioner informed

16 defense counsel that he had struck Johnson with a weighted, lead-lined "sap glove." (*Id.* at

17 18, 44-46; *see id.* at 90, 128.) Thorpe testified that Petitioner's story about the sap glove was

18 the "third or fourth version" he had given as to how he killed Johnson. (*Id.* at 16.) Petitioner

19 also provided the information about the sap glove to Dr. Philip Kanof, a toxicologist retained

20 by the defense. (*Id.* at 18-19, 128.) According to Thorpe, Dr. Kanof orally informed her that

21 he was prepared to testify that Petitioner was suffering from methamphetamine-induced

22

23     [6]     Petitioner also alleged in Claim 4-A that counsel performed ineffectively by
24 failing to present expert testimony during the guilt phase of trial. The Court found that this
   aspect of the claim was procedurally barred. (Dkt. 86 at 17.) In Claim 4-C(3) below, the
25 Court addresses Petitioner's challenge to counsel's handling of expert testimony at
   sentencing.
26

27     [7]     "RT" refers to the court reporter's transcript. "ME" refers to the state court's
   minute entries. Copies of the state court record on appeal, as well as the original trial
28 transcripts, were provided to this Court by the Arizona Supreme Court. (*See* Dkts. 55, 60.)

psychosis at the time of the murder. (*Id.* at 19.)

Darby testified that his goal in defending Petitioner was to avoid a first-degree murder conviction. (*Id.* at 70.) He was convinced there was a good chance Petitioner would be convicted of second-degree murder and confident Petitioner would not be sentenced to death. (*Id.* at 53, 65, 70, 11.) Darby also believed Petitioner would be granted a new trial or relief on appeal based on the trial court's failure to provide lesser-included murder instructions. (*Id.* at 20-22.) Darby and Thorpe concluded that evidence showing Petitioner used a weapon to kill the victim would be harmful to the defense because it indicated premeditation. (*Id.* at 48, 53, 71.) It would also provide support for the cruel, heinous, or depraved aggravating factor. (*Id.* at 29.) Finally, in counsel's view, the evidence would potentially jeopardize the defense on retrial. (*Id.* at 21-22.) Because Dr. Kanof was aware that Petitioner had used a weapon to kill the victim, Darby chose not to present his testimony at trial or at sentencing and risk the possible negative consequences resulting from disclosure of the sap glove evidence. (*Id.* at 52-53.) Co-counsel Thorpe agreed with this strategy, and drafted a memorandum documenting their decision, which Petitioner signed after discussing the matter with counsel. (*Id.* at 20-24, 52-53; *see* Petition for Review, 3/17/03, Ex. E.)

However, counsel also determined that Petitioner's testimony was necessary to support the defense theory that Petitioner did not act with premeditation, but reacted spontaneously to the victim's homosexual advances. (*Id.* at 33, 60-61, 77.) According to Darby, Petitioner testified willingly. (*Id.* at 75.) Darby advised Petitioner not to volunteer information about the sap glove but to answer truthfully if the question was raised on cross-examination. (*Id.* at 46, 48, 56, 131.)

Petitioner's *Strickland* expert, a criminal defense attorney named Bret Huggins, testified that Darby performed at a constitutionally deficient level. (*Id.* at 98.) Huggins stated that he could see no benefit to calling Petitioner as a witness at the guilt phase of trial. (*Id.* at 101-02.) Petitioner's testimony that he struck the victim with his bare hand was discredited by the evidence from the medical examiner; as a result, the jury saw Petitioner

as a liar.[8]  (*Id.* at 101)  Huggins conceded, however, that the outcome of the guilt stage of trial would not have changed if Petitioner's testimony had been omitted.  (*Id.* at 119.) Huggins also testified that counsel performed ineffectively at sentencing by failing to call Dr. Kanof, whose testimony would have supported the impaired capacity statutory mitigating factor.  (*Id.* at 103.)

According to Petitioner's testimony at the evidentiary hearing, he was under the impression that he would not testify at trial because counsel had never discussed the issue with him.  (*Id.* at 129, 132.)  Petitioner stated that the night before he testified Darby and Thorpe met with him for an hour or less.  (*Id.* at 130.)  They told him he needed to testify in order to avoid a first-degree murder conviction and death sentence.  (*Id.*)  It was only at this point, according to Petitioner, that Darby asked him about the facts of the murder.  (*Id.*) When Petitioner told him about using the sap glove, Darby explained that such information would be damaging and that Petitioner should simply testify that he struck the victim with his hand.  (*Id.* at 131.)  According to Petitioner, Darby told him that such testimony would be technically true and Petitioner would not be testifying falsely, as long as the prosecutor did not ask him if he had anything on his hand.  (*Id.* at 131-32.)  Petitioner had confidence in his attorneys and followed their advice.  (*Id.* at 132.)  When asked at the evidentiary hearing what alternative strategy the defense should have pursued, Petitioner responded:  "I could have not testified.  I could have gotten on the stand and told a different story.  I could have lied in a different fashion.  I could have had my attorney try to fight the testimony of the State's witnesses."  (*Id.* at 154.)

The PCR court rejected Petitioner's claim that counsel performed ineffectively by presenting his testimony.  The court, noting that Petitioner's own *Strickland* expert testified that there was no reasonable probability of a different verdict if Petitioner had not testified

---

[8]      Huggins also testified that he would not have recommended that Petitioner testify more forthcomingly and reveal that he had used a sap glove to strike the victim.  (*Id.* at 101-02.)

falsely, found that Petitioner had not been prejudiced by counsel's performance.[9] (ME 1/10/03 at 2.) The court further explained:

> The basic problem with Defendant's argument is its logic. A defendant who falsely claims to have killed a victim in a rage does not thereby provide a jury with sufficient evidence to convict him of killing with premeditation. Such a conviction must be established, as it was in this case, by evidence other than that of the Defendant's lies. Accordingly, the Court finds that Defendant's false testimony played no role in his convictions.
>
> Similarly, his false testimony did not influence the Court's sentencing decisions. . . . The Court arrived at its decision to sentence Petitioner to death based solely on the aggravating and mitigating evidence. Defendant's untruthful testimony neither established aggravation nor rebutted mitigation. Accordingly, the Court finds that Defendant's false testimony played no role in its choice of sentences.
>
> . . . Defendant argues that his trial counsel was ineffective for even calling him to testify. . . . As noted above, the Court finds no connection between Defendant's untruthful testimony and his convictions and sentence. He thus fails to prove that he was prejudiced by his decision to testify. In any event, the decision to testify was his, not his counsel's, though the decision was made with counsel's advice.

(*Id.* at 3-4.)

*Analysis*

The PCR court's rejection of this claim was not based on an unreasonable application of *Strickland*. Petitioner's testimony did not prejudice him at the guilt stage of trial. As the state court noted, Petitioner's false version of events did not provide support for a finding of premeditation. Nor was there a reasonable probability of a different verdict if Petitioner had testified truthfully about the weapon used to kill the victim or if he had remained silent and left uncontested the evidence suggesting he acted with premeditation and for pecuniary gain in attacking the victim and taking his car and wallet. Moreover, without Petitioner's testimony, the jury would have been left with no information about Petitioner's condition at the time of the crime, including the fact that he was suffering the effects of withdrawal after

---

[9] Because the PCR court's ruling focused on *Strickland*'s prejudice prong, and given the *Strickland* court's instruction to dispose of ineffective assistance claims based on lack of prejudice where it is easier to do so, 466 U.S. at 697, this Court will not make a determination as to the reasonableness of counsel's strategic decisions.

a nearly week-long methamphetamine binge.

The cases Petitioner relies on are distinguishable. For example, in *Johnson v. Baldwin*, 114 F.3d 835 (9th Cir. 1997), the defendant provided uncorroborated and unconvincing testimony that he was not present at the scene of the crime. The court found that counsel's failure to investigate the defendant's "incredibly lame" alibi and confront him with the "difficulties of his story" constituted ineffective assistance of counsel. *Id.* at 838. If counsel had conducted such an investigation and challenged the defendant with its results, the defendant "probably would not have elected to lie to the jury." *Id.* at 840. Counsel's performance was prejudicial because the State's case against the defendant was "extremely weak" and the jury's "adverse credibility determination . . . probably tipped the scale against him." *Id.* In Petitioner's case, by contrast, there was no failure to investigate; counsel were aware of Petitioner's latest version of the killing. In addition, the case against Petitioner was not weak; he admitted killing the victim, and it was only his testimony that provided any alternative to the State's evidence that the killing was premeditated. *See Carter v. Lee*, 283 F.3d 240, 249-53 (4th Cir. 2002) (rejecting ineffective assistance claim based on petitioner's contention that he was "forced" to testify when counsel advised him that his testimony was necessary to support diminished capacity defense, and finding no prejudice where case against petitioner was strong); *United States v. Sanchez-Cervantes*, 282 F.3d 664, 672 (9th Cir. 2002) (advising defendant to testify was not an objectively unreasonable strategic decision and there was no prejudice because evidence against defendant was strong).

Another reason the Court cannot find prejudice is because Petitioner has offered alternate versions of what his truthful testimony would have been. According to the memorandum he signed for trial counsel, as well as an affidavit drafted for the PCR proceedings, Petitioner told counsel and Dr. Kanof that when the victim placed his hand on Petitioner's knee, he reached into his "fanny pack," grabbed the sap glove, and struck Johnson repeatedly. (Petition for Review, 3/17/93, Ex. C.) At the PCR evidentiary hearing, however, Petitioner testified that he donned the glove when he stepped outside the vehicle

to use the restroom; he intended to use the glove to threaten Johnson if he refused to drive

him back to town. (RT 9/9/02 at 158-60.) Petitioner argues that instead of presenting either

version of his truthful testimony, the strategically better alternative would have been not to

call Petitioner to testify on his own behalf. Again, this would have left the jury with no

explanation for the crime beyond the most damaging version presented through the State's

evidence.

Claim 4-B

Petitioner alleges that counsel performed ineffectively by failing to file a motion to

vacate the judgment after two witnesses came forward who supported the defense theory.

(Dkt. 82 at 76-78.)

During the aggravation/mitigation hearing defense counsel called two witnesses,

Eddie Galvaz and Michael Schmitz, to testify about the victim's alleged homosexual

tendencies. Galvaz, a former employee of the School of Music who had been terminated due

to misconduct and was pursuing legal action against the University, testified that he believed

Professor Johnson had "homosexual leanings." (RT 8/22/96 at 8, 15-16, 29.) According to

Galvaz, Johnson would pat him on the shoulder or buttocks while Galvaz distributed the

mail. (*Id.* at 10.) Galvaz also stated that he and Johnson interacted while using the restroom;

Johnson would inquire about Galvaz's social activities, asking about the gay bars Galvaz

frequented, and would hug him around the hips while Galvaz used the urinal. (*Id.* at 11.)

According to Galvaz, Johnson also made remarks to him about the "cute Mexican boys"

Johnson saw around the school, and once commented on a picture he had taken of Galvaz,

telling him he "looked good in his nice, tight jeans." (*Id.* at 11-12.) Schmitz testified that

Professor Johnson, who was his graduate advisor, offered to give him a pair of old jeans and

measured him to see if they wore the same pants length. (*Id.*) Schmitz later told Galvaz that

he believed Johnson might be gay. (*Id.*) Long-time colleagues and friends of Professor

Johnson testified that he was a "decent family man"; they had never observed or heard

reports of any inappropriate behavior on his part or any indications that he was gay. (*Id.* at

30, 34.)

The PCR court rejected the claim that trial counsel performed ineffectively by failing to move to vacate the judgment based on this information. (ME 1/10/05 at 4-5.) The court explained:

> A motion to vacate judgment under Rule 24.2(a)(2), on the grounds of newly discovered evidence, is evaluated under the standards of Rule 32.1. Assuming that this evidence could have been properly submitted under a motion to vacate judgment, the main question is whether its admission "probably would have changed" the outcome of defendant's trial. Rule 32.1(e). A motion to vacate judgment and grant a new trial is properly denied if the testimony of the proffered witness does not appear reliable or credible to the trial court.
>
> Here, the Court listened to Galvaz and Schmitz at the sentencing hearing, yet concluded in its special verdict that "it is unreasonable and flies in the face of logic to believe that this murder was motivated by rage . . . . [T]he only motivation proved beyond a reasonable doubt is that [the victim's] murder was for pecuniary gain." Further, the Court found that "[t]he clear implication of the evidence is that [D]efendant formed the intent to profit from the murder no later than when he picked up the object he used to bludgeon [the victim]. The evidence is not reasonably susceptible to any other interpretation." Because the Court reached these conclusions after having listened to Galvaz and Schmitz, it is clear that the Court did not find their testimony sufficient to contradict the conclusion that Defendant's motivation was pecuniary gain. The Court finds that the introduction of this evidence at trial would not have changed the verdicts. Accordingly, counsel did not fall below reasonable professional standards by not submitting this testimony in a motion to vacate judgment.

(*Id.* (citation omitted).)

The PCR court did not unreasonably apply *Strickland* in rejecting this claim. Petitioner was not prejudiced by counsel's failure to file a motion to vacate because there was no reasonable probability that the trial judge would have granted the motion. At best, the testimony of Galvaz and Schmitz, if viewed as credible, suggested that Professor Johnson was gay. It offers no support for Petitioner's defense that he killed Johnson spontaneously in reaction to the victim's sexual overtures. As the trial and PCR courts observed, Petitioner's version of events was belied by the evidence of how the attack occurred. The state courts considered the new information from Galvaz and Schmitz and correctly determined that it had no bearing on the evidence showing that Petitioner did not "freak out" during a homosexual encounter, but committed the murder in order to gain access to the

- 14 -

victim's property.

Claim 4-C(3)

Petitioner asserts that sentencing counsel performed ineffectively by failing to present testimony from a toxicologist concerning Petitioner's impaired mental capacity due to methamphetamine use and withdrawal at the time of the crime. (Dkt. 82 at 87-89.) According to Petitioner, the omitted evidence would have supported a finding, pursuant to A.R.S. § 13-703(G)(1), that his capacity to appreciate the wrongfulness of his conduct or conform his conduct to the law was significantly impaired. (*Id.* at 88-89.)

*Background*

At trial, Petitioner testified that he used methamphetamine regularly from 1991 to the time of the murder. (*Id.* at 23.) He "[l]ived to get the drug." (*Id.*) He used methamphetamine continuously in the days before the murder, with his last usage occurring on the morning of the murder. (RT 3/13/96 at 23-61.) During this period Petitioner slept and ate very little. (*Id.* at 23-61.)

Petitioner described the effects of withdrawal from methamphetamine, testifying that users get "violent" and "crazy" when coming off the drug. (*Id.* at 49.) Petitioner testified that he was "jonesing," or experiencing cravings for methamphetamine, when he encountered the victim on the night of the 28th. (*Id.* at 89.) His goals at that point were to obtain drugs and win back his estranged girlfriend. (*Id.* at 162.)

Following Petitioner's conviction, the trial court held an aggravation/mitigation hearing. Defense counsel presented testimony from Petitioner's parents, ex-wife, step-brother, and step-mother. Their testimony demonstrated that Petitioner's family life was unstable and dysfunctional. His parents separated when he was 12 or 13. (RT 7/29/96 at 26, 45.) After the separation, Petitioner lived primarily with his father, a trapper, who migrated between Arizona and Washington state. (*Id.* at 21-24, 45-46.) Petitioner's mother began to lead a "wild" life style, setting a bad example by exposing Petitioner to drugs, including methamphetamine; she testified that her behavior contributed to Petitioner's criminal

conduct. (*Id.* at 47-48.) The witnesses testified about Petitioner's drug problem and its negative effect on his behavior and his family relationships. (*Id.* at 31-32; 48-49; 63-64.) They also offered humanizing testimony describing Petitioner's positive character traits, including his intelligence, his talent as a motorcycle mechanic, his love for his children, and the absence of any prior violent behavior. (*Id.* at 27-29, 58-60, 73-74.) In addition to this testimony, counsel submitted letters from Petitioner's family and a social history composed by Petitioner and counsel. (*Id.* at 84-85.)

In sentencing Petitioner to death, the trial court found that the State had proved two aggravating factors, that the murder was committed for pecuniary gain and was especially heinous or depraved. (RT 8/26/96 at 4-5, 8.) The court found that Petitioner failed to prove any statutory mitigating factors, but that his drug use and withdrawal and his lack of a felony record constituted nonstatutory mitigation. (*Id.* at 10.)

The Arizona Supreme Court, in its independent review of the death sentence, struck the heinous or depraved aggravating factor. *Greene*, 192 Ariz. at 441, 967 P.2d at 116. The court then reweighed the aggravating and mitigating circumstances and affirmed the sentence. In doing so, the court addressed the (G)(1) mitigating factor as follows:

Greene argues that the trial court erred by failing to find that due to his drug use, his "capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law was significantly impaired."

Greene testified that at the time of the murder he was withdrawing from drugs. Other than his own statement, Greene presented no evidence of the effect the withdrawal had on his capacity to appreciate the wrongfulness of his conduct or his ability to conform his conduct to the requirements of the law at the time of the offense.

To the contrary, Greene's behavior shows that he did appreciate the wrongfulness of his conduct. After the murder, Greene asked Bevan for clean pants and shoes. Because Bevan did not have pants for him, Greene rubbed dirt on the bloodstains, "trying to be as inconspicuous as possible." Greene also took a small rug to cover the bloody car seats. In addition, he feigned injury to his hand in order to use Johnson's stolen credit cards. We agree with the trial court that the evidence is insufficient to establish the existence of the (G)(1) mitigating circumstance. Furthermore, we agree that Greene failed to establish any of the mitigating factors in A.R.S. § 13-703(G). Greene's drug use on the days before the murder is undisputed. From Friday, February 24, 1995, until Tuesday, February 28, 1995 (the date of the murder), Greene used methamphetamine every day. During this time he ate very little and did not

> sleep. . . . Greene testified that he was not under the influence of drugs at the time he killed. Nor was there expert testimony of any causal connection between drug use or withdrawal and the offense. While it is true that Greene killed to get money to buy drugs, this is not the sort of causal connection that would support a claim of mitigation. To hold that a motivation to kill fueled in part by a desire for drugs is mitigating would be anomalous indeed. We reject this claimed mitigating circumstance.

*Greene*, 192 Ariz. at 441-42, 967 P.2d at 116-17 (citations omitted).

As described above, at the evidentiary hearing before the PCR court, Thorpe and Darby testified that they decided not to present Dr. Kanof's testimony about methamphetamine psychosis, fearing that the sap glove evidence would support the cruel, heinous, or depraved aggravating factor and would harm Petitioner's defense if he were granted a new trial. Petitioner signed a memorandum endorsing that decision. Having decided not to call Dr. Kanof, counsel had Petitioner examined by another mental health expert, Dr. Kathryn Boyer. (RT 9/9/02 at 27, 37.) Dr. Boyer determined that Petitioner had an above average IQ and diagnosed him with antisocial personality disorder; neither finding would have benefitted Petitioner as a mitigating circumstance. (*Id.*)

The PCR court rejected Petitioner's claim that counsel's failure to present Dr. Kanof's testimony at sentencing constituted ineffective assistance. Addressing the prejudice prong of the *Strickland* test, the court explained:

> Defendant next argues that he received ineffective assistance of counsel at sentencing. He complains that counsel should have called Dr. Kanof, a toxicologist, who would have testified that Defendant suffered from a disassociative state due to methamphetamine-induced psychosis at the time of the murder. The toxicologist did not testify, however, because Defendant did not want it revealed that he had told the toxicologist that he had used the "sap" glove to kill the victim. As a result, no such evidence of the disassociative state was presented at sentencing. Such evidence, Defendant maintains, would have established a causal connection between his drug use or withdrawal and the murder, which would have persuaded the Court to find the existence of the mitigating factor set forth in A.R.S. § 13-703(G)(1).
>
> . . . .
>
> The argument is purely speculative. There is nothing in the record to suggest what Dr. Kanof would have told the Court, had he been called. There is no evidence that Dr. Kanof performed tests or prepared a report. Defendant's counsel remember having been informed orally of the diagnosis and concluding therefrom that it was sufficient to establish the (G)(1) factor. Defendant did not attach to this petition the doctor's affidavit that could have

established the factual grounds of the alleged diagnosis. See Rule 32.5. The only evidence that Dr. Kanof diagnosed the Defendant at all is hearsay elicited at the evidentiary hearing.

But, even assuming such a diagnosis was made, it does not establish even a rebuttal causal connection between his drug use or withdrawal and the murder. All evidence, in fact, suggests the opposite. Defendant "killed to get money to buy drugs," as shown by his actions after the murder and his own testimony. 192 Ariz. at 441, 967 P.2d at 116. Defendant testified that the two most important things in his life at the time were to get more drugs and to win back his girlfriend. *Id.* at 439, 967 P.2d at 114. Moreover, "[o]n cross-examination, he stated unequivocally that neither usage nor withdrawal from methamphetamine had ever affected his memory." *Id.* At the evidentiary hearing, Defendant testified that he put on the "sap" glove, not in response to the victim's alleged homosexual advances, but "[a]s a threat in case [he] needed to use it" to persuade the victim to drive him back to town. Further, there is no evidence that Defendant's heavy drug use or withdrawal, which started more than 10 years before the murder, had ever caused him to act violently. His only prior conviction was for misdemeanor theft. On this record, the Court finds that counsel did not fall below professional standards by not calling Dr. Kanof.

(ME 1/10/03 at 5-6.)

*Analysis*

The right to effective assistance of counsel applies not just to the guilt phase but "with equal force at the penalty phase of a bifurcated capital trial." *Silva v. Woodford*, 279 F.3d 825, 836 (9th Cir. 2002) (quoting *Clabourne v. Lewis*, 64 F.3d, 1373, 1378 (9th Cir. 1995)). In assessing whether counsel's performance was deficient under *Strickland*, the test is whether counsel's actions were objectively reasonable at the time of the decision. *Strickland*, 466 U.S. at 689-90. The question is "not whether another lawyer, with the benefit of hindsight, would have acted differently, but 'whether counsel made errors so serious that counsel was not functioning as the counsel guaranteed the defendant by the Sixth Amendment.'" *Babbitt v. Calderon*, 151 F.3d 1170, 1173 (9th Cir. 1998) (quoting *Strickland*, 466 U.S. at 687).

With respect to prejudice at sentencing, the *Strickland* Court explained that "[w]hen a defendant challenges a death sentence . . . the question is whether there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." 466 U.S. at 695. In

*Wiggins v. Smith*, 539 U.S. 510, 534 (2003), the Court noted that "[i]n assessing prejudice, we reweigh the evidence in aggravation against the totality of available mitigating evidence." The totality of the available evidence includes "both that adduced at trial, and the evidence adduced in the habeas proceeding." *Id.* at 536 (quoting *Williams v. Taylor*, 529 U.S. at 397-98). Recently, the Court reiterated that "*Strickland* places the burden on the defendant, not the State, to show a 'reasonable probability' that the result would have been different." *Belmontes*, --- U.S. ----, 130 S. Ct. at 390-91.

The PCR court reasonably applied *Strickland* in rejecting this challenge to counsel's performance at sentencing, rightly noting that the claim relies on speculation. There was no basis for the PCR court to find that Petitioner met his burden of proving he was prejudiced by counsel's failure to present Dr. Kanof's testimony at sentencing. Without a report or affidavit from Dr. Kanof, there is no way to know whether he could have offered medical or psychological support for his theory of methamphetamine-induced psychosis, what such psychosis entailed, or how it would have affected Petitioner's conduct at the time of the crimes. Absent such evidence, Petitioner cannot meet his burden of affirmatively proving prejudice.

Other factors militate against a finding that Petitioner was prejudiced by counsel's failure to present Dr. Kanof's testimony. First, trial counsel did present significant evidence through Petitioner's own testimony that he was a methamphetamine addict who was suffering severe withdrawal symptoms and whose primary goal at the time of the murder was to acquire funds with which to obtain drugs. Moreover, in reviewing Petitioner's death sentence, the Arizona Supreme Court held that the desire to obtain drugs did not constitute a mitigating factor under § 13-703(G)(1). This ruling limits the effect of Dr. Kanof's proposed testimony, which could only have supported a finding of nonstatutory mitigation. As already noted, the sentencing court did determine that Petitioner's drug use and withdrawal constituted a nonstatutory mitigating circumstance, so additional testimony on the issue would have had little impact on the state courts' sentencing considerations. Given

these circumstances, Petitioner cannot sustain a claim of ineffective assistance of counsel based on the omission of Dr. Kanof's testimony.

In *Raley v. Ylst*, 470 F.3d 792, 801-03 (9th Cir. 2006), trial counsel retained three separate mental health experts to interview the defendant, provide a report, and possibly testify at trial. The reports provided by the experts, however, were at best equivocal and in some instances harmful to the defendant's case; they included findings that he was "callous," "dangerous," and a "sexual psychopath." *Id.* Trial counsel decided not to call the experts at trial. *Id.* On habeas review, the Ninth Circuit concluded that this was a reasonable strategic decision made after reasonable investigation and did not constitute ineffective assistance of counsel. *Id.* The court also found that the defendant was not prejudiced given the double-edged nature of the experts' findings and the fact that the link between the defendant's abusive childhood and his later crimes was not "so esoteric" as to require explanation by an expert. *Id.* at 802-03. *See Nields v. Bradshaw*, 482 F.3d 442, 455-56 (6th Cir. 2007) (rejecting ineffective assistance claim based on counsel's failure to retain an expert to testify about the causal relationship between the defendant's alcoholism and his behavior on the night of the murder). In Petitioner's case, counsel decided not to call Dr. Kanof in order to avoid disclosure of evidence that counsel believed would damage Petitioner's case at sentencing and in any future proceedings. Nonetheless, the sentencing judge was provided a detailed account, through Petitioner's trial testimony and the testimony of family members during the aggravation/mitigation hearing, of Petitioner's history of drug abuse, its effects on his behavior, and his condition at the time of the murder. The negative effects of drug abuse and withdrawal are not so esoteric as to elude a lay person's understanding, as demonstrated by the sentencing judge's determination that Petitioner's drug use constituted a nonstatutory mitigating circumstance.

Finally, as the Arizona Supreme Court and PCR court noted, the evidence at trial did not support a finding that Petitioner's capacity to appreciate the wrongfulness of his conduct or conform his conduct to the law was significantly impaired as required by the (G)(1)

mitigating factor. To the contrary, the evidence showed that Petitioner committed the crime with the goal of obtaining funds; that he took numerous steps to conceal his actions and evade capture; and that after the killing, employing a ruse to explain the discrepancy in his and the victim's signatures, he used Johnson's credit cards to purchase items that could be sold for cash to purchase drugs or utilized in his attempt to flee the area. Also, as revealed in his trial testimony, Petitioner's memory of the events surrounding the murder was vivid and complete, further belying the contention that he was significantly impaired by drug use or withdrawal.

Conclusion

The PCR court's rejection of Petitioner's ineffective assistance of counsel claims did not constitute an unreasonable application of clearly established federal law. Applying the doubly deferential level of review mandated by *Strickland* and the AEDPA, the Courts finds that Claims 4-A, 4-B, and 4-C(3) are without merit.

**Claim 6-B:  Pecuniary Gain Aggravating Factor**

Petitioner alleges that there was insufficient evidence to support the state courts' findings regarding the pecuniary gain aggravating. (Dkt. 82 at 108-16.)

The trial court determined that the State had proved beyond a reasonable doubt that Petitioner committed the murder in the expectation of pecuniary gain under A.R.S. § 13-703(F)(5). (RT 8/26/96 at 5.) In support of its ruling the court made the following findings:

> Resolution of this issue balances the testimony of [medical examiner] Dr. Sibley that the type and amount of damage to [the] victim could not have been caused by Beau John Greene's bare hand. In order to cause such damage, the defendant had to have used an implement such as a rock or club.
>
> The defendant's defense, and his most recent version of events, maintained he hit Roy Johnson with Greene's bare hand in a moment of sudden rage. Dr. Sibley's testimony destroys the truth of the defendant's story because Beau John Greene had to have made a conscious effort to use an instrument for the purposes of beating the victim in order to cause the injuries suffered by Roy Johnson. It is impossible to believe the defendant's version of events in view of the existing uncontroverted medical evidence. Without a doubt, as the jury found, the defendant premeditated the murder of Roy Johnson. In view of this evidence, it is unreasonable and flies in the face of logic to believe that this murder was motivated by rage. In view of these facts, the only motivation proved beyond a reasonable doubt is that Roy Johnson's

murder was for pecuniary gain.

Nor does the physical evidence support the defendant's story that he formed the intent to take the victim's wallet and automobile only after Beau John Greene had killed Roy Johnson. With regard to the theft of the wallet, this portion of the defendant's story might have been corroborated by a second set of footprints leading to the body, but the evidence shows just one set of prints. For this reason the Court concludes that the defendant lied about both hitting Roy Johnson with his bare hand and about returning to the wash to get the wallet.

The clear implication of the murder is that the defendant formed the intent to profit from the murder no later than the moment when he picked up the object he used to bludgeon Roy Johnson. This evidence is not reasonably susceptible to any other interpretation.

(*Id.* at 4-5.)

On direct appeal, the Arizona Supreme Court likewise rejected Petitioner's challenge to the pecuniary gain aggravating factor:

The trial court found that the medical testimony and the crime scene evidence completely negated Greene's version of the killing. According to the medical examiner, Greene could not have fractured Johnson's skull with his fists. Further, the medical examiner testified that a heavy flat object was used to kill Johnson. The use of an instrument implies premeditation. It also undermines Greene's account and, therefore, his credibility. Likewise, evidence at the crime scene reveals the falsity of Greene's proffered motivation for the killing. The single set of tire tracks and footprints near the wash indicates that Greene did not return for Johnson's wallet as he claims, but instead had the wallet with him when he left the wash immediately following the murder.

The trial court's finding that Greene intended to profit from the murder was also supported by Greene's admitted need for money, drugs, and transportation. Greene testified that he was hungry, tired, and craving methamphetamine when he encountered Johnson. He was homeless, had no transportation, and was attempting to avoid a drug dealer who had threatened to shoot him over an outstanding debt. Greene testified that the two most important things in his life at the time were to get more drugs and to win back his girlfriend.

Greene's actions after the murder also demonstrate a pecuniary motive. Driving Johnson's car, and within hours of the murder, Greene began using Johnson's credit cards. Greene wrapped his hand in K-Y jelly and gauze and feigned injury to explain any discrepancy in credit card signatures. With the stolen credit cards, he purchased camping equipment, food, and electronic equipment that he later traded for drugs. He also bought food and took it to his girlfriend's house for her son.

Greene argues the court failed to properly consider the effect of his methamphetamine use on his ability to accurately perceive and recall the events that night. But if Greene's memory is suspect, all that remains is

uncontradicted evidence offered by the state. Moreover, during trial, Greene recalled, in great detail, events both before and after the murder. On cross examination, he stated unequivocally that neither usage nor withdrawal from methamphetamine had ever affected his memory.

We have held that when one comes to rob, the accused expects pecuniary gain and this desire infects all other conduct. *See State v. Landrigan*, 176 Ariz. 1, 6, 859 P.2d 111, 116 (1993). The evidence supports beyond a reasonable doubt a finding that Greene, coming off of methamphetamine and penniless, killed Johnson to obtain cash or credit cards so that he could make fraudulent purchases to exchange for money or drugs. Thus, the trial court found that Greene's admitted need for money, drugs, and transportation in combination with the crime scene evidence showed that Greene intended to profit from the murder no later than the moment he picked up the object to kill Johnson. We agree. Greene murdered Johnson for pecuniary gain.

*Greene*, 192 Ariz. at 438-39, 967 P.2d at 113-14.

Analysis

With respect to a state court's application of an aggravating factor, habeas review "is limited, at most, to determining whether the state court's finding was so arbitrary and capricious as to constitute an independent due process or Eighth Amendment violation." *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990). In making that determination, the reviewing court must inquire "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found that the factor had been satisfied." *Id.* at 781 (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). This standard "gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 319.

"[A] finding that a murder was motivated by pecuniary gain for purposes of § 13-703(F)(5) must be supported by evidence that the pecuniary gain was the impetus of the murder, not merely the result of the murder." *Moormann v. Schriro*, 426 F.3d 1044, 1054 (9th Cir. 2005). A rational factfinder could have determined that Petitioner killed Johnson in order to obtain money and transportation, not because he was disturbed by the victim's homosexual advances. The evidence showed that prior to the murder Petitioner was broke, tired, hungry, desperate for drugs, and determined to regain the affections of his estranged

girlfriend. To commit the murder he armed himself with an object capable of crushing Johnson's skull. Immediately after the murder he took the victim's car and wallet, concocted the ruse that his hand was injured, and went on a spending spree. The only reasonable inference to be drawn from this evidence, none of which was in serious dispute, was that Petitioner was motivated by pecuniary gain to kill Johnson. Therefore, Petitioner is not entitled to relief on Claim 6-B.

## CERTIFICATE OF APPEALABILITY

Pursuant to Rule 11 of the Rules Governing § 2254 Cases, the Court has evaluated the claims within the petition for suitability for the issuance of a certificate of appealability (COA). *See* 28 U.S.C. § 2253(c); *Turner v. Calderon*, 281 F.3d 851, 864-65 (9th Cir. 2002).

Rule 22(b) of the Federal Rules of Appellate Procedure provides that when an appeal is taken by a petitioner, the district judge who rendered the judgment "shall" either issue a COA or state the reasons why such a certificate should not issue. Pursuant to 28 U.S.C. § 2253(c)(2), a COA may issue only when the petitioner "has made a substantial showing of the denial of a constitutional right." This showing can be established by demonstrating that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner" or that the issues were "adequate to deserve encouragement to proceed further." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (citing *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)). For procedural rulings, a COA will issue only if reasonable jurists could debate whether the petition states a valid claim of the denial of a constitutional right and whether the court's procedural ruling was correct. *Id.*

The Court finds that reasonable jurists could debate its resolution of Claims 4-A and 4-C(3). For the reasons stated in this order, and in the order of October 6, 2006 (Dkt. 86), the Court declines to issue a COA with respect to any other claims.

Based on the foregoing,

**IT IS ORDERED** that Petitioner's Amended Petition for Writ of Habeas Corpus (Dkt. 82) is **DENIED**. The Clerk of Court shall enter judgment accordingly.

1    **IT IS FURTHER ORDERED** that the stay of execution entered by this Court on

2    December 9, 2003 (Dkt. 2), is **VACATED.**

3    **IT IS FURTHER ORDERED GRANTING** a Certificate of Appealability as to the

4    following issues:

5    Whether Claim 4-A, alleging that counsel performed ineffectively by
     presenting his testimony and advising him to testify untruthfully, is without
6    merit.

7    Whether Claim 4-C(3), alleging ineffective assistance of counsel at sentencing
     based on counsel's failure to present expert testimony from a toxicologist, is
8    without merit.

9    **IT IS FURTHER ORDERED** that the Clerk of Court forward a courtesy copy of

10   this Order to the Clerk of the Arizona Supreme Court, 1501 W. Washington, Phoenix, AZ

11   85007-3329.

12   DATED this 31st day of March, 2010.

13

14

15

16                                                    FRANK R. ZAPATA
17                                                    United States District Judge

18

19

20

21

22

23

24

25

26

27

28