1  **WO**

2

3

4

5  **IN THE UNITED STATES DISTRICT COURT**

6  **FOR THE DISTRICT OF ARIZONA**

7

8  Beau John Greene,                              No. CV-03-00605-TUC-JCH

9               Petitioner,                       **ORDER**

10  v.                                            <u>DEATH PENALTY CASE</u>

11  David Shinn, et al.,

12               Respondents.

13

14        This case is before the Court on remand from the Ninth Circuit Court of Appeals.

15        Petitioner Beau John Greene is an Arizona death row inmate. On March 31, 2010,

16  this Court denied his amended petition for writ of habeas corpus. (Doc. 93.) On December

17  1, 2014, the Ninth Circuit granted Greene's request for a "limited remand," ordering the

18  Court to reconsider, in light of intervening law, Claim 4(A) in part (alleging ineffective

19  assistance of trial counsel for failing to present expert testimony at trial) and Claim 4(C) in

20  part (alleging ineffective assistance of trial counsel for failing to investigate and present

21  mitigating evidence and failing to counter the aggravating factor). (Doc. 104.) The

22  intervening law cited by the Ninth Circuit includes *Martinez v. Ryan*, 566 U.S. 1 (2012),

23  which, as discussed below, held that the ineffective assistance of post-conviction counsel

24  can excuse the default of a claim of ineffective assistance of trial counsel.

25        On December 29, 2015, the Ninth Circuit issued its en banc opinion in *McKinney v.

26  Ryan*, 813 F.3d 798 (9th Cir. 2015). *McKinney* held that the Arizona Supreme Court, for a

27  period of time which included its consideration of Greene's direct appeal, had violated

28  *Eddings v. Oklahoma*, 455 U.S. 104, 114 (1982), in its capital sentencing analysis by

requiring a defendant to show a causal nexus between his proffered mitigating evidence and the crime. On October 27, 2016, this Court ordered Greene to file a motion with the Ninth Circuit seeking expansion of the remand to include the impact of *McKinney* on his habeas petition. (Doc. 127.)

On December 16, 2016, the Ninth Circuit granted in part Greene's motion to expand the remand, directing this Court to address (1) the impact of *McKinney* on Greene's petition and (2) whether, in light of *Pizzuto v. Ramirez*, 783 F.3d 1171, 1178 (9th Cir. 2015), reconsideration is warranted as to Claim 5 (alleging that trial counsel had a conflict of interest). (Doc. 128.)

The issues have been fully briefed. (Docs. 116, 121, 126, 132, 135, 137.)

## BACKGROUND

Greene was convicted and sentenced to death for the murder of Roy Johnson, a music professor at the University of Arizona in Tucson. The following account of the facts surrounding the crime is based on the decision of the Arizona Supreme Court affirming Greene's murder conviction and death sentence, *State v. Greene*, 192 Ariz. 431, 967 P.2d 106 (1998), and this Court's review of the record.

Johnson was last seen around 9:30 p.m. on February 28, 1995, leaving a church where he had just given an organ recital. His wife expected him home before 10:00 p.m., but he did not return. Four days later, authorities found his body lying in a wash. Greene admitted at trial that he killed Johnson.

On the day of the murder, Greene's friends, Tom Bevan and Loriann Verner, told him he could no longer stay in their trailer outside of Tucson. A drug dealer had threatened to shoot Greene over an outstanding debt, and Bevan and Verner feared that Greene's presence in their trailer would ruin their relationship with the dealer. Greene stole a truck and drove to Tucson where the truck broke down. Sometime that night, during Johnson's drive home from the concert, he encountered Greene.

Greene testified that he had been using methamphetamine continuously for several days and was suffering from withdrawal. He was resting in a park when Johnson stopped

his car and approached him. According to Greene, Johnson wanted to perform oral sex on him and offered to pay for it. Greene accepted and the two drove to a secluded parking lot in Johnson's car. Greene testified that he changed his mind and told Johnson that he would not follow through. In response, Johnson purportedly smiled and touched Greene's leg. At that point, Greene "freaked out" and struck Johnson several times in the head with his fist. He moved Johnson's body to the back of the car and drove to a wash where he dumped the body. He walked back to the car and drove away. According to Greene, he then realized he needed money so he returned to the wash, walked down to the body, and stole Johnson's wallet.

After dumping the body, Greene drove Johnson's car directly to Bevan and Verner's trailer, where he told Bevan about the killing. Greene asked Bevan for some clean shoes. He also took a rug to cover the bloody car seats.

Greene left the trailer and headed for K-mart, the first of several stops he made on a shopping spree using the victim's cash and credit cards. To explain the discrepancy between his signature and those on the credit cards, Greene wrapped his hand with K-Y jelly and gauze to simulate a burn injury. He bought clothes, food, camping gear, a scope and air rifle, car cleaner, and a VCR, which he later traded for methamphetamine. He eventually abandoned Johnson's car in the desert. Several days later, the police arrested Greene at a friend's house.

The trial evidence undermined Greene's version of the killing. First, medical testimony indicated that the damage to the victim's skull was inflicted by a heavy flat object, not by a fist. The bones of a fist striking a person's head will shatter before the thick bones of the skull, and Greene's hands were uninjured. Second, a single set of tire tracks and footprints entered and left the wash where the body was found, suggesting that Greene did not return for the wallet but had it with him when he left immediately after the murder. Third, Greene told Bevan he beat someone to death with a club.

At trial, Johnson's wife, S.J., testified that she "laughed out loud" when she heard Greene's allegations about her husband's actions. (RT 3/12/96 at 92.) She testified that her

husband was "a man of great honor and integrity, of great moral principle, of deep, abiding faith," and that he was as "devoted to [her] as [she] was to him." (*Id.*) She claimed there were "no secrets" between her and her husband and that she knew him well enough "to know whether he had a secret side to him as was described in court." (*Id.* at 92–93.) She stated, "We were not only husband and wife, we were the very, very best of friends." (*Id.* at 93.)

The jury convicted Greene of kidnapping, robbery, and first-degree murder. The trial judge sentenced him to death for the murder and terms of imprisonment for the other counts.[1] On direct appeal, the Arizona Supreme Court reversed the kidnapping conviction but otherwise affirmed. *Greene*, 192 Ariz. 431, 967 P.2d 106.

Greene filed a petition for post-conviction relief (PCR) in state court in August 2000, and an amended petition in December 2001. Following an evidentiary hearing, the PCR court denied relief in January 2003. In December 2003, the Arizona Supreme Court summarily denied a petition for review. Greene then initiated the instant habeas proceedings, filing a petition for writ of habeas corpus on December 5, 2003, and an amended petition on December 21, 2004. (Docs. 1, 82.)

**DISCUSSION**

**I.      *Martinez* Remand**

In his supplemental *Martinez* brief, Greene raises, along with the two ineffective assistance of counsel claims that were the subject of remand, Claim 1, alleging a *Brady* violation, and Claim 5, alleging that trial counsel had a conflict of interest.[2] (Doc. 116 at

---

[1] At the time of Greene's trial, Arizona law required trial judges to make all factual findings relevant to capital punishment and to determine the sentence. Following the United States Supreme Court's decision in *Ring v. Arizona*, 536 U.S. 584 (2002), which held that a jury must determine the existence of facts rendering a defendant eligible for the death penalty, Arizona's sentencing scheme was amended to provide for jury determination of eligibility factors, mitigating circumstances, and sentence.

[2] *Brady v. Maryland*, 373 U.S. 83, 87 (1963), held that a defendant's due process rights are violated when a prosecutor fails to disclose evidence that is material to guilt or punishment.

18, 106.) As noted, Claim 5 was included in the Ninth Circuit's second remand order. (Doc. 128.)

Respondents argue that Greene is not permitted to expand the limited remand by adding Claim 1. (Doc. 121 at 14–15.) The Court agrees.

The Ninth Circuit has "repeatedly held . . . that a district court is limited by this court's remand in situations where the scope of the remand is clear." *United States v. Thrasher*, 483 F.3d 977, 982–83 (9th Cir. 2007) (quoting *Mendez-Gutierrez v. Gonzales*, 444 F.3d 1168, 1172 (9th Cir. 2006)). "A district court that has received the mandate of an appellate court cannot vary or examine that mandate for any purpose other than executing it." *Hall v. City of Los Angeles*, 697 F.3d 1059, 1067 (9th Cir. 2012) (citing *United States v. Cole*, 51 F.3d 178, 181 (9th Cir. 1995)); *see Creech v. Ramirez*, No. 1:99-CV-00224-BLW, 2017 WL 1129938, at *11 (D. Idaho Mar. 24, 2017). Greene is not entitled to expand the remand to include Claim 1.

In addition, as Greene acknowledges, *Martinez* applies only to claims of ineffective assistance of trial counsel. It has not been expanded to excuse the default of other types of claims. *Pizzuto*, 783 F.3d at 1177 (noting that the Ninth Circuit has "not allowed petitioners to substantially expand the scope of *Martinez* beyond the circumstances present in *Martinez*"). In fact, the Ninth Circuit has specifically held that *Martinez* does not apply to a defaulted *Brady* claim. *Hunton v. Sinclair*, 732 F.3d 1124, 1126–27 (9th Cir. 2013) (explaining that only the Supreme Court can expand the application of *Martinez*).

Accordingly, the Court will not consider Claim 1, which remains procedurally defaulted and barred from federal review.

### A.     Applicable law

#### 1.     *Martinez v. Ryan*

Federal habeas review is generally unavailable for a claim that was not raised in state court and is therefore procedurally defaulted. In such situations, review is barred unless the petitioner can demonstrate cause and prejudice or a fundamental miscarriage of justice that excuses the default. *Coleman v. Thompson*, 501 U.S. 722, 750 (1991). *Coleman*

1  held that ineffective assistance of counsel in post-conviction proceedings cannot establish

2  cause for a claim's procedural default. *Id.*

3      In *Martinez*, however, the Supreme Court announced a new, "narrow exception" to

4  that rule. The Court explained that:

5      Where, under state law, claims of ineffective assistance of trial counsel must
       be raised in an initial-review collateral proceeding, a procedural default will
6      not bar a federal habeas court from hearing a substantial claim of ineffective
       assistance at trial if, in the initial-review collateral proceeding, there was no
7      counsel or counsel in that proceeding was ineffective.

8  566 U.S. at 17; *see also Trevino v. Thaler*, 569 U.S. 413, 418 (2013).

9      Accordingly, under *Martinez* an Arizona habeas petitioner may establish cause and

10 prejudice for the procedural default of a claim of ineffective assistance of trial counsel by

11 demonstrating that (1) PCR counsel was ineffective and (2) the underlying ineffective

12 assistance claim has some merit. *Cook v. Ryan*, 688 F.3d 598, 607 (9th Cir. 2012) (quoting

13 *Martinez*, 566 U.S. at 14); *see, e.g.*, *Atwood v. Ryan*, 870 F.3d 1033, 1059–60 (9th Cir.

14 2017).

15     To establish "cause" under *Martinez*, a petitioner must demonstrate that PCR

16 counsel was ineffective under *Strickland v. Washington*, 466 U.S. 668 (1984). *Clabourne*

17 *v. Ryan*, 745 F.3d 362, 377 (9th Cir. 2014), *overruled on other grounds by McKinney*, 813

18 F.3d at 819. *Strickland* requires a demonstration "that both (a) post-conviction counsel's

19 performance was deficient, and (b) there was a reasonable probability that, absent the

20 deficient performance, the result of the post-conviction proceedings would have been

21 different." *Clabourne*, 745 F.3d at 377 (citation omitted).

22     To establish "prejudice" under the second prong of *Martinez*'s "cause and

23 prejudice" analysis, a petitioner must demonstrate that his underlying ineffective assistance

24 of trial counsel claim is "substantial." *Id.* In *Martinez*, the Supreme Court defined a

25 "substantial" claim as a claim that "has some merit," noting that the procedural default of

26 an ineffective assistance claim will not be excused if the claim itself "is insubstantial, i.e.,

27 it does not have any merit or . . . is wholly without factual support." *Martinez*, 566 U.S. at

28 14–16.

The Court stated that the standard for finding a claim "substantial" is analogous to the standard for issuing a certificate of appealability. *Id.* at 14; *see Detrich v. Ryan*, 740 F.3d 1237, 1245 (9th Cir. 2013). Under that standard, a claim is "substantial" if "reasonable jurists could debate whether the issue should have been resolved in a different manner or that the claim was adequate to deserve encouragement." *Id.* (citing *Miller-El v. Cockrell* 537 U.S. 322, 336 (2003)).

A finding of "prejudice" for purposes of the "cause and prejudice" analysis, which requires only a showing that the underlying claim of ineffective assistance of trial counsel is substantial, "does not diminish the requirement . . . that petitioner satisfy the 'prejudice' prong under *Strickland* in establishing ineffective assistance by post-conviction counsel." *Clabourne*, 745 F.3d at 377.

The Ninth Circuit has offered guidance in assessing whether "cause" exists under *Martinez*. In *Atwood*, for example, the court explained:

> In evaluating whether the failure to raise a substantial claim of ineffective assistance of trial counsel in state court resulted from ineffective assistance of state habeas counsel under *Strickland*, we must evaluate the strength of the prisoner's underlying ineffective assistance of trial counsel claim. If the ineffective assistance of trial counsel claim lacks merit, then the state habeas counsel would not have been deficient for failing to raise it. Further, any deficient performance by state habeas counsel would not have been prejudicial, because there would not be a reasonable probability that the result of the post-conviction proceedings would have been different if the meritless claim had been raised.

870 F.3d at 1059–60; *see Hooper v. Shinn*, 985 F.3d 594, 627 (9th Cir. 2021); *see also Sexton v. Cozner*, 679 F.3d 1150, 1157 (9th Cir. 2012) ("PCR counsel would not be ineffective for failure to raise an ineffective assistance of counsel claim with respect to trial counsel who was not constitutionally ineffective.").

In *Runningeagle v. Ryan*, 825 F.3d 970 (9th Cir. 2016), the court addressed the standard for finding PCR counsel's performance prejudicial. The court explained that under *Martinez*:

> Although the prejudice at issue is that in PCR proceedings, this is a recursive standard. It requires the reviewing court to assess trial counsel's as well as PCR counsel's performance. This is because, for us to find a reasonable probability that PCR counsel prejudiced a petitioner by failing to raise a trial-

level IAC [ineffective assistance of counsel] claim, we must also find a reasonable probability that the trial-level IAC claim would have succeeded had it been raised.

*Id.* at 982; *see Murray (Roger) v. Schriro*, 882 F.3d 778, 816 (9th Cir. 2018).

Finally, as already noted, the Ninth Circuit has held that the *Martinez* exception also applies to procedurally defaulted claims alleging conflict-of-interest of trial counsel. *Pizzuto*, 783 F.3d at 1178. The exception has not, however, been extended to other types of claims. *See Davila v. Davis*, 137 S. Ct. 2058, 2065 (2017) (holding that *Martinez* does not apply to underlying claims of ineffective assistance of appellate counsel); *Martinez (Ernesto) v. Ryan*, 926 F.3d 1215, 1225 (9th Cir. 2019) ("[I]neffective assistance of PCR counsel can constitute cause only to overcome procedurally defaulted claims of ineffective assistance of trial counsel."); *Hunton*, 732 F.3d at 1126–27.

2.      Ineffective Assistance of Counsel

Claims of ineffective assistance of counsel are governed by the principles set out in *Strickland*, 466 U.S. 668. To prevail under *Strickland*, a petitioner must show that counsel's representation fell below an objective standard of reasonableness and that the deficiency prejudiced the defense. *Id.* at 687–88. The inquiry under *Strickland* is highly deferential. "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 689; *see Wong v. Belmontes*, 558 U.S. 15, 16–17 (2009) (per curiam). The "standard is necessarily a general one," *Bobby v. Van Hook*, 558 U.S. 4, 7 (2009), because "[n]o particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant." *Strickland*, 466 U.S. at 688–89.

To establish deficient performance a petition must "show[] that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687. A petitioner must overcome "the presumption that, under the circumstances, the challenged action might be considered

sound trial strategy." *Id.* at 689 (quotation omitted). "The question is whether an attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom." *Harrington v. Richter*, 562 U.S. 86, 105 (2011) (quoting *Strickland*, 466 U.S. at 690).

With respect to *Strickland*'s second prong, a petitioner must affirmatively prove prejudice by "show[ing] that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." 466 U.S. at 694. The petitioner "bears the highly demanding and heavy burden [of] establishing actual prejudice." *Allen v. Woodford*, 395 F.3d 979, 1000 (9th Cir. 2005) (quoting *Williams (Terry) v. Taylor*, 529 U.S. 362, 394 (2000)). For claims of ineffective assistance of counsel at sentencing in capital cases, prejudice is assessed by "reweigh[ing] the evidence in aggravation against the totality of available mitigating evidence." *Wiggins v. Smith*, 539 U.S. 510, 534 (2003). The totality of the available evidence includes "both that adduced at trial, and the evidence adduced" in subsequent proceedings. *Id.* at 536 (quoting *Williams (Terry)*, 529 U.S. at 397–98). "If the difference between the evidence that could have been presented and that which actually was presented is sufficient to 'undermine confidence in the outcome' of the proceeding, the prejudice prong is satisfied." *Duncan v. Ornoski*, 528 F.3d 1222, 1240 (9th Cir. 2008) (quoting *Strickland,* 466 U.S. at 694).

Because an ineffective assistance of counsel claim must satisfy both prongs of *Strickland*, the reviewing court "need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies." *Strickland*, 466 U.S. at 697. "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed." *Id.*; *see Rhoades v. Henry*, 638 F.3d 1027, 1049 (9th Cir. 2011).

### 3.    Evidentiary Development

In *Cullen v. Pinholster*, 563 U.S. 170 (2011), the Supreme Court held that where the state court has denied a habeas petitioner's claim under 28 U.S.C. § 2254(d), review by the

federal court "is limited to the record that was before the state court that adjudicated the claim on the merits."[3] *Id.* at 181. However, where a state court has not adjudicated the merits of a claim because of a procedural bar, a district court may consider new evidence in determining whether the petitioner can overcome that bar. *See Dickens v. Ryan*, 740 F.3d 1302, 1321 (9th Cir. 2014) (holding that *Pinholster* did not bar petitioner from presenting new evidence to support a cause-and-prejudice argument under *Martinez* because *Pinholster* applies only to claims previously "adjudicated on the merits in State court proceedings"); *Detrich*, 740 F.3d at 1246–47 ("*Pinholster*'s predicates are absent in the context of a procedurally defaulted claim in a *Martinez* case.").

In *Dickens* the court also rejected the argument that 28 U.S.C. § 2254(e)(2) barred evidentiary development, explaining that a petitioner seeking to show "cause" under *Martinez* is not asserting a "claim."[4] 740 F.3d at 1321. ("A federal court's determination of whether a habeas petitioner has demonstrated cause and prejudice . . . is not the same as a hearing on a constitutional claim for habeas relief."); *see Woods v. Sinclair*, 764 F.3d 1109, 1138 n.16 (9th Cir. 2014) (explaining that neither *Pinholster* nor § 2254(e)(2) "categorically bar [a petitioner] from obtaining such a hearing or from presenting extra-record evidence to establish cause and prejudice for the procedural default. . . .").

Accordingly, contrary to Respondents' argument (*see* Doc. 121 at 20, 33), in carrying out its analysis under *Martinez*, the Court will consider the entirety of the record, including the new evidence developed by Greene during these habeas proceedings, in support of the defaulted claims.

## B. Additional Facts

Greene was represented at trial by Jill Thorpe and David Darby, with Darby as lead counsel. (RT 9/9/02 at 12, 17.) Thorpe was primarily responsible for the sentencing stage

---

[3] This case is governed by the Antiterrorism and Effective Death Penalty Act of 1996, 28 U.S.C. § 2254 ("AEDPA").

[4] 28 U.S.C. § 2254(e)(2) severely limits the circumstances in which a federal habeas court may hold an evidentiary hearing on claims not developed in state court.

1   of the trial. (*Id.* at 12.) A third attorney, Julie Duval, also assisted the defense. (*Id.* at 86–
2   87.)

3        At trial, Greene testified that he used methamphetamine regularly from 1991 to the
4   time of the murder. (RT 3/13/96 at 23.) He "[l]ived to get the drug." (*Id.*) He used
5   methamphetamine continuously in the days before the murder, with the latest use occurring
6   on the morning of the crime. (*Id.* at 23–61.) During this period he slept and ate very little.
7   (*Id.*)

8        Greene described the effects of withdrawal from methamphetamine, testifying that
9   users get "violent" and "crazy" when coming off the drug. (*Id.* at 49.) He testified that he
10  was "jonesing," or experiencing cravings, when he encountered the victim on the night of
11  the twenty-eighth. (*Id.* at 89.) His goals at that point were to obtain drugs and win back his
12  estranged girlfriend. (*Id.* at 162.) As noted above, Greene testified that he "freaked out"
13  when Johnson put his hand on his leg and struck Johnson with his fist. (*Id.* at 90.) During
14  the attack Greene "started almost hallucinating" and felt like he was "somewhere else."
15  (*Id.* at 196.)

16       Following Greene's conviction, the trial court held an aggravation/mitigation
17  hearing. Defense counsel Thorpe presented testimony from Greene's parents, John and
18  Wilma; his ex-wife, Linda; his stepbrother; and his stepmother. Their testimony depicted
19  an unstable and dysfunctional family life. Greene's parents separated when he was twelve
20  or thirteen. (RT 7/29/96 at 26, 45.) Afterwards, Greene lived primarily with his father, who
21  worked as a trapper and migrated between Arizona and Washington state. (*Id.* at 21–24,
22  45–46.) Greene's parents decided he should live with his father because Wilma was afraid
23  she would turn Greene into a "sissy" if he lived with her. (*Id.* at 46.) John testified that he
24  had "no love lost for homosexuals," and he assumed Greene shared that attitude. (*Id.* at
25  26.)

26       When she and John broke up, Wilma "went hog wild and got into the drugs and the
27  drinking and the partying." (*Id.* at 47.) She set a bad example by exposing Greene to drugs,

28

including methamphetamine, and testified that her behavior contributed to Greene's criminal conduct. (*Id.* at 47–48.)

Wilma testified that John used the term "faggots" to describe homosexuals. She believed his feelings about homosexuality got across to Greene, who looked up to his father and wanted his respect. (*Id.* at 50–51.)

The witnesses also testified about Greene's drug problem and its negative effect on his behavior and his family relationships. (*Id.* at 31–32, 48–49, 63–64.)

They also offered humanizing testimony describing Greene's positive character traits, including his intelligence, his talent as a motorcycle mechanic, his love for his children, and the absence of any prior violent behavior. (*Id.* at 27–29, 58–60, 73–74.) Greene's ex-wife testified that his execution "would have a very bad effect on [her] children." (*Id.* at 68.) In addition to this testimony, counsel submitted letters from Greene's family, family photographs, and a "social history" consisting of a transcript of counsel's interview of Greene about his "early history."[5] (*Id.* at 84–85.)

The court continued the hearing so Greene could present two additional witnesses to support the defense theory that Johnson was gay and had propositioned Greene. Eddie Galvaz, a former employee of the Music Department, testified that Johnson would touch him on the shoulder and pat his buttocks. (RT 8/22/96 at 10.) According to Galvaz, who is gay, Johnson would converse with him while they were using urinals in the men's room; he would give Galvaz a "little hug" "around the hip area" while Galvaz talked about the gay bars he frequented. (*Id.* at 11.) Galvaz testified that Johnson spoke about the "cute Mexican boys" around the school, and once commented about the "nice tight jeans" Galvaz was wearing in a photograph Johnson took. (*Id.* at 12–13.) Galvaz, who never reported these incidents, acknowledged that he had been fired from the University for fraud. (*Id.* at 16.) Michael Schmitz was one of Johnson's graduate advisees. He testified that he

---

[5] Co-counsel Thorpe interviewed Greene on June 8 and July 16 and 24, 1996. (Doc. 117-2, Ex. 52.)

suspected Johnson might be gay after an incident in which Johnson had them stand side by side to see if a pair of Johnson's jeans would fit Schmitz. (*Id.* at 25.)

In rebuttal, the State called Robert Sankey, a colleague and family friend who knew Johnson very well. (*Id.* at 33.) Sankey testified that he never heard rumors or speculation that Johnson was anything other than a decent family man, nor any suggestions that Johnson was gay. (*Id.* at 34.)

In her closing argument, defense counsel Thorpe addressed, as mitigating circumstances, Greene's isolation as a child, the family's lack of stability, and the negative influence of his mother, who facilitated Greene's drug and alcohol abuse, and father, whose extreme and homophobic views Greene adopted. (*Id.* at 58–59.)

Thorpe also discussed an incident in which Greene, at around age thirteen, was at a bar with his mother when he was picked up by a man who took him to his ranch and sexually molested him.[6] (*Id.* at 60.) She argued that this prior incident of sexual abuse was going through Greene's mind at the time he attacked Johnson. (*Id.* at 63.) Thorpe also spoke about an incident in which Greene was arrested for bringing his mother's marijuana to his elementary school. (*Id.* at 61.) That same day, as the marijuana incident was being investigated, Greene's sister reported being molested by their father, who was temporarily removed from the home. (*Id.*)

Thorpe also argued that Greene's history of drug abuse and his withdrawal from methamphetamine were mitigating circumstances. (*Id.* at 61–62.) She contended that the effects of withdrawal impaired Greene's ability to conform his conduct to the law. (*Id.* at 61.)

In sentencing Greene to death, the trial court found that the State had proven two aggravating factors: that the murder was committed for pecuniary gain, under A.R.S. § 13–703(F)(5), and was especially heinous or depraved, under § 13–703(F)(6).[7] (Doc. 135-2,

---

[6] Greene discussed these incidents in more detail in his interviews with Thorpe. (Doc. 117-2, Ex. 52, July 16, 1996, interview at 2–6; July 24, 1996, interview at 6–8.)

[7] Section 13–703 has since been renumbered. The Court cites the version in use at the time

1    Ex. C, ME 8/26/9, at 1–5.) The court found that Greene failed to prove any statutory

2    mitigating circumstances, but that his drug use and withdrawal and his lack of a felony

3    record constituted nonstatutory mitigation. (*Id.* at 10.)

4          On direct appeal, the Arizona Supreme Court struck the heinous or depraved

5    aggravating factor but affirmed the pecuniary gain factor. *Greene*, 192 Ariz. at 441, 967

6    P.2d at 116. The court then reweighed the aggravating and mitigating circumstances and

7    affirmed the death sentence. *Id.* at 443–44, 967 P.2d at 118–19.

8          During the subsequent PCR proceedings, Greene, represented by attorney Michael

9    Villareal, raised claims of ineffective assistance of counsel. He alleged that trial counsel

10   performed ineffectively by allowing Greene to testify falsely that he hit the victim with his

11   bare hand. (Doc. 121-1, Ex. A, PCR Pet., at 11–16, 20–21.) He also alleged that counsel

12   performed ineffectively by failing to present the testimony of a toxicologist. (*Id.* at 16–20.)

13   Finally, he alleged that counsel performed ineffectively by failing to file a motion to vacate

14   judgment following the testimony of Galvaz and Schmitz. (*Id.* at 21–24.) Greene also

15   argued, citing newly discovered evidence of an affair between the victim's wife and Robert

16   Sankey, that he was entitled to a new trial because of Mrs. Johnson's false testimony about

17   her relationship with her husband. (*Id.* at 37–42.)

18        The PCR court held an evidentiary hearing. Greene testified, as did his trial counsel

19   and a *Strickland* expert. Co-counsel Thorpe testified that Greene informed defense counsel

20   that he had struck Johnson with a weighted, lead-lined "sap glove." (RT 9/9/02 at 18, 44–

21   46; *see id.* at 90, 128.) She testified, however, that Greene's story about the sap glove was

22   the "third or fourth version" he had given about how he killed Johnson. (*Id.* at 16.)

23   According to Thorpe, Greene also provided the information about the sap glove to Dr.

24   Philip Kanof, a toxicologist retained by the defense.[8] (*Id.* at 18–19, 128.) Thorpe testified

25

26   of Greene's trial and sentencing.

27   [8] Dr. Kanof was retained for the mitigation stage of trial. (RT 9/9/02 at 18–20.) He did not
      complete his examination or write a report. (*See* Doc. 118-1, Ex. 53.) Dr. Gary Perrin, a

28   psychologist, examined Greene in December 1995, before trial. Greene also told Dr. Perrin
      that he had used a sap glove to kill Johnson. (*See, e.g.*, Doc. 116-1, Ex. 3, ¶ 9; RT 9/9/02

1  that Dr. Kanof orally informed her that he was prepared to testify that Greene was suffering

2  from methamphetamine-induced psychosis at the time of the murder. (*Id.* at 19.)

3  Lead counsel Darby testified that his goal in defending Greene was to avoid a first-

4  degree murder conviction. (*Id.* at 70.) He was convinced there was a good chance Greene

5  would be convicted of second-degree murder and confident Greene would not be sentenced

6  to death. (*Id.* at 53, 65, 70.) He believed, however, that "without [Greene's] testimony, he

7  had no chance of getting anything short . . . of a conviction for first degree murder." (*Id.* at

8  57; *see id.* at 61.) Darby also believed Greene would be granted a new trial or relief on

9  appeal based on the trial court's failure to provide lesser-included murder instructions. (*Id.*

10  at 20–22.)

11  Darby and Thorpe concluded that evidence showing Greene used a weapon to kill

12  the victim would be harmful to the defense because it suggested premeditation. (*Id.* at 48,

13  53, 71.) It would also provide support for the cruel, heinous, or depraved aggravating

14  factor. (*Id.* at 29.)

15  Finally, in counsel's view, the sap-glove evidence would potentially jeopardize the

16  defense on retrial. (*Id.* at 21–22.) Because Dr. Kanof was aware that Greene had used a

17  weapon to kill the victim, Darby chose not to present his testimony. (*Id.* at 52–53.) Thorpe

18  agreed with this strategy and drafted a memorandum documenting their decision, which

19  they discussed with Greene. (*Id.* at 20–24, 52–53; *see* Doc. 121-1, Ex. A, PCR Pet.,

20  Appendix, "Memorandum.")

21  Having decided not to call Dr. Kanof, counsel had Greene examined by another

22  mental health expert, Dr. Kathryn Boyer. (RT 9/9/02 at 27, 37.) Dr. Boyer determined that

23  Greene had an above average IQ and diagnosed him with antisocial personality disorder.

24  These findings would not have benefitted Greene as mitigation, so counsel did not present

25  Dr. Boyer's testimony. (*Id.*)

26  Counsel determined that Greene's testimony was necessary to support the defense

27  theory that Greene did not act with premeditation but instead reacted spontaneously to the

28  _____

at 88–89.)

victim's homosexual advances. (*Id.* at 33, 60–61, 77.) According to Darby, Greene testified willingly. (*Id.* at 75.) Darby advised Greene not to volunteer information about the sap glove but to answer truthfully if the question were raised on cross-examination. (*Id.* at 46, 48, 56, 131.)

The *Strickland* expert, attorney Bret Huggins, testified that trial counsel performed ineffectively in advising Greene to testify falsely—namely, to testify that he struck the victim with his hand while omitting the fact that he used a sap glove. (*Id.* at 98–99.) According to Huggins, there was "absolutely no benefit" to presenting testimony that was easily refuted by the medical examiner's testimony. (*Id.* at 101.) Presenting Greene's testimony also prevented counsel from offering Dr. Kanof's testimony at sentencing, which would have supported the (G)(1) statutory mitigating circumstance.[9] (*Id.* at 103.) Huggins conceded that his recommended strategy of not presenting Greene's testimony at all would not have resulted in a different verdict at the guilt phase of trial. (*Id.* at 119.) He testified, however, that offering Dr. Kanof's testimony in mitigation would have drawn a causal connection between the crime and Greene's drug use and withdrawal and would have made a difference at sentencing. (*Id.*)

Greene testified that he did not know he was going to testify at his trial—in fact he was under the impression that he would not—until the night before he was called, when he had a discussion with Darby and Thorpe. (*Id.* at 130.) During that discussion Greene told counsel he had used a sap glove to kill Johnson. (*Id.* at 130–31.) Darby told Greene that the only way to avoid a conviction for first-degree murder was for Greene to testify but not to volunteer that he had used the glove. (*Id.* at 131.) After Greene was convicted, counsel informed him that Dr. Kanof would testify that Greene was suffering from methamphetamine-induced psychosis at the time of the crime. (*Id.* at 135.) When counsel learned that Greene had told Dr. Kanof about the sap glove, they decided they would not

---

[9] Under A.R.S. § 13–703(G)(1), a mitigating circumstance exists where "[t]he defendant's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law was significantly impaired, but not so impaired as to constitute a defense to prosecution."

present his testimony and had Greene sign a document agreeing to that decision. (*Id.* at 136–39.)

On cross-examination, Greene testified that he put the sap glove on when he stepped outside the vehicle to use the restroom, intending to use it to threaten Johnson if he refused to drive him back to town. (*Id.* at 158–60.) This version of events is inconsistent with the account Greene provided to counsel and Dr. Kanof. In the memorandum documenting counsel's decision not to present Dr. Kanof's testimony, Greene stated that he had told counsel and Kanof that when the victim placed his hand on his knee, Greene reached into his "fanny pack," grabbed the sap glove, and struck Johnson. (*See* Doc. 121-1, Ex. A, PCR Pet., Appx., Memorandum at 2.)

The PCR court rejected Greene's claim that counsel's failure to present Dr. Kanof's testimony at sentencing constituted ineffective assistance. (Doc. 121-1, Ex. B, ME 1/10/03, at 5–6.) Greene had argued that testimony about being in a dissociative state due to methamphetamine-induced psychosis would have established a causal connection to the murder and established the (G)(1) mitigating circumstance. The court rejected this claim as "purely speculative," explaining:

> There is nothing in the record to suggest what Dr. Kanof would have told the Court, had he been called. There is no evidence that Dr. Kanof performed tests or prepared a report. Defendant's counsel remember having been informed orally of the diagnosis and concluding therefrom that it was sufficient to establish the (G)(1) factor. Defendant did not attach to this petition the doctor's affidavit that could have established the factual grounds of the alleged diagnosis. *See* Rule 32.5. The only evidence that Dr. Kanof diagnosed the Defendant at all is hearsay elicited at the evidentiary hearing.
>
> But, even assuming such a diagnosis was made, it does not establish even a rebuttal causal connection between his drug use or withdrawal and the murder. All evidence, in fact, suggests the opposite. Defendant "killed to get money to buy drugs," as shown by his actions after the murder and his own testimony. Defendant testified that the two most important things in his life at the time were to get more drugs and to win back his girlfriend. Moreover, "[o]n cross-examination, he stated unequivocally that neither usage nor withdrawal from methamphetamine had ever affected his memory." At the evidentiary hearing, Defendant testified that he put on the "sap" glove, not in response to the victim's alleged homosexual advances, but "[a]s a threat in case [he] needed to use it" to persuade the victim to drive him back to town. Further, there is no evidence that Defendant's heavy drug use or withdrawal, which started more than 10 years before the murder, had ever caused him to act violently. His only prior conviction was for misdemeanor theft. On this

record, the Court finds that counsel did not fall below professional standards by not calling Dr. Kanof.

(*Id.*) (citations omitted).

### C.    Analysis

The ineffective assistance of counsel claims that were remanded pursuant to *Martinez* are Claim 4(A), in part, and subparts (1) and (2) of Claim 4(C). The remaining portion of Claim 4(A), alleging that trial counsel performed ineffectively by presenting Greene's false testimony at trial, and subpart (3) of Claim 4(C), alleging that trial counsel performed ineffectively at sentencing by failing to offer Dr. Kanof's testimony, were exhausted in state court. This Court denied the claims on the merits, finding that the PCR court's rejection of the claims was reasonable. (Doc. 93 at 8–13, 15–21.)

Although the exhausted portions of Claim 4(A) and 4(C) are not part of the remand, Greene argues in his supplemental *Martinez* brief that the Court must consider their allegations as part of a "cumulative" review of trial counsel's performance. (Doc. 116 at 27, 30, 42, 131.) He further argues that a cumulative review is appropriate because it was errors made by PCR counsel that led the PCR court and this Court to deny on the merits the exhausted portion of Claim 4(A) and Claim 4(C)(3). (*See id.* at 27, 42.)

Without deciding whether a second review of these exhausted subclaims is permitted on remand, the Court determines, for the reasons already stated in its prior denial of the subclaims, that a cumulative review of the ineffective assistance allegations would not alter the *Martinez* analysis set forth below.

First, with respect to the claim that counsel performed ineffectively by advising Greene to testify falsely, the PCR court found that Greene was not prejudiced because his false testimony supported neither the element of premeditation nor any aggravating factor.[10] (Doc. 121-1, Ex. C, ME 1/10/03, at 3–4.) In fact, Greene's testimony provided the only support for the defense theory that he acted impulsively while experiencing the effects of methamphetamine withdrawal. The exhausted portion of Claim 4(A), because it is

---

[10] In Claim 5 below, the Court sets out this analysis in more detail.

1    without merit, adds no cumulative weight to Greene's ineffective assistance of trial counsel

2    claims.

3         With respect to Claim 4(C)(3), alleging that counsel performed ineffectively by

4    failing to present Dr. Kanof's testimony at sentencing, as noted above the PCR court denied

5    the claim because it was not supported by evidence of Dr. Kanof's opinion and because the

6    facts of the case demonstrated that Greene committed the murder in a premeditated manner

7    and with the purpose of obtaining funds to buy drugs. (Doc. 121-1, Ex. B, ME 1/10/03, at

8    5–6.)

9         This Court found that the PCR court reasonably applied *Strickland* in rejecting the

10   claim. (Doc. 93 at 19.) In addition to noting the lack of evidentiary support for the claim

11   before the PCR court, this Court explained that trial counsel did "present significant

12   evidence through [Greene's] own testimony that he was a methamphetamine addict who

13   was suffering severe withdrawal symptoms. . . ." (*Id.*) The Court also explained that the

14   import of Dr. Kanof's proposed testimony was limited because the "Arizona Supreme

15   Court held that the desire to obtain drugs did not constitute a mitigating factor under § 13–

16   703(G)(1)" and because the trial court "did determine that [Greene's] drug use and

17   withdrawal constituted a nonstatutory mitigating circumstance." (*Id.*) Therefore,

18   "additional testimony on the issue would have had little impact on the state courts'

19   sentencing considerations." (*Id.*) The Court concluded that, notwithstanding counsel's

20   strategic decision not to call Dr. Kanof, "the sentencing judge was provided a detailed

21   account, through Petitioner's trial testimony and the testimony of family members during

22   the aggravation/mitigation hearing, of [Greene's] history of drug abuse, its effects on his

23   behavior, and his condition at the time of the murder." (*Id.* at 20.) The Court then noted,

24   citing *Raley v. Ylst*, 470 F.3d 792, 803 (9th Cir. 2006), that the "negative effects of drug

25   abuse and withdrawal are not so esoteric as to elude a lay person's understanding, as

26   demonstrated by the sentencing judge's determination that [Greene's] drug use constituted

27   a nonstatutory mitigating circumstance." (*Id.*) Finally, as discussed below, the Court

28   explained that the trial evidence did not support a finding that Greene's drug use or

1    withdrawal impaired his capacity to appreciate the wrongfulness of his conduct or conform

2    his conduct to the law. (*Id.* at 20–21.)

3        Accordingly, if the Court were to consider again the allegation in Claim 4(C)(3),

4    adding it to the allegations of ineffective assistance of trial counsel raised in the remanded

5    claims, the cumulative weight of the claims would not be altered. *See Mancuso v. Olivarez*,

6    292 F.3d 939, 957 (9th Cir. 2002) ("Because there is no single constitutional error in this

7    case, there is nothing to accumulate to a level of a constitutional violation."), *overruled on*

8    *other grounds by Slack v. McDaniel*, 529 U.S. 473 (2000).

9        The Court now turns to the remanded claims to determine whether their default is

10   excused under *Martinez*.

11       1.    Claim 4(A) (in part)

12       In Claim 4(A) of his amended petition, Greene alleged, in relevant part, that counsel

13   performed ineffectively during the guilt phase of trial by failing to present Dr. Kanof's

14   testimony. (Doc. 82-3 at 74.) Dr. Kanof would have testified about the effect of chronic

15   methamphetamine use on Greene's "mental state" at the time of the crime. (Doc. 116 at

16   38.) Greene raised this claim in his PCR petition but not in his petition for review, so the

17   Court found it defaulted. (Doc. 86 at 14–17.) The PCR court rejected the claim on the

18   merits, finding that evidence of Greene's mental state would have been inadmissible under

19   A.R.S. § 13–503. (Doc. 121, Ex. B, ME 1/10/03, at 5 n.1.)

20       A.R.S. § 13–503 provides that:

21       Temporary intoxication resulting from the voluntary ingestion, consumption,
         inhalation or injection of alcohol, an illegal substance under chapter 34 of
22       this title or other psychoactive substances or the abuse of prescribed
         medications does not constitute insanity and is not a defense for any criminal
23       act or requisite state of mind.

24       Therefore, during the guilt phase of trial a toxicologist would not have been allowed

25   to testify about the effect of methamphetamine use or withdrawal on Greene's "mental

26   state" at the time of the crime. *See State v. Boyston*, 231 Ariz. 559, 550, 298 P.3d 887, 898

27   (2013) ("Because premeditation is a mental state and part of the mens rea element of

28   premeditated first degree murder . . . , it is thus a 'requisite state of mind' of that offense.

1   Section 13–503 therefore precludes evidence of voluntary intoxication when considering

2   premeditation."); *State v. Kiles*, 222 Ariz. 25, 33, 213 P.3d 174, 182 (2009) (explaining

3   that under § 13–503 voluntary intoxication is not a defense to a charge that defendant

4   murdered the victim knowingly and with premeditation).[11]

5          Trial counsel did not perform ineffectively. Because the proposed testimony would

6   not have been admissible under Arizona law, counsel's failure to offer it was neither

7   deficient nor prejudicial. *See Rupe v. Wood*, 93 F.3d 1434, 1445 (9th Cir. 1996) (explaining

8   that failing to take a futile action cannot constitute deficient performance); *see also Stanley*

9   *v. Schriro*, 598 F.3d 612, 620 (9th Cir. 2010) ("No prejudice is suffered when counsel

10  declines to pursue the development of testimony that would be inadmissible at trial"—

11  namely, evidence of a dissociative reaction to challenge premeditation); *Wilson v. Henry*,

12  185 F.3d 986, 990 (9th Cir. 1999) ("A decision not to pursue testimony by a psychiatric

13  expert, when no mental state defense seems likely, is not unreasonable under *Strickland*.").

14         PCR counsel, in turn, did not perform ineffectively by failing to include this

15  meritless ineffective assistance claim in his petition for review. *See Atwood*, 870 F.3d at

16  1059–60; *Runningeagle*, 825 F.3d at 982; *Hooper*, 985 F.3d at 627. Greene therefore

17  cannot show "cause" under *Martinez* for the claim's default. The unexhausted portion of

18  Claim 4(A) remains procedurally defaulted and barred from federal review.

19         2.     Claim 4(C)(1)

20         In Claim 4(C)(1) of his amended petition, Greene alleged that counsel performed

21  ineffectively at sentencing by failing to investigate and present additional mitigating

22  evidence about Greene's background. (Doc. 82-4 at 82, 93.) He asserted that counsel were

23  ineffective because they "merely presented lay testimony that [Greene] was a drug addict"

24  and the "bulk of the mitigation was the 'good character type.'" (*Id.* at 96.)

25         Greene catalogued the mitigating evidence he alleges counsel should have

26  presented. (*Id.* at 86–102.) He was a "small, sickly child" who experienced febrile seizures.

27  ───────────────

28  [11] Greene does not address Respondents' arguments about the inadmissibility of Dr.
    Kanof's testimony under A.R.S. § 13–503.

1    (*Id.* at 93.) Until he was three, his family lived near a Superfund site where he was exposed

2    to toxins. (*Id.*) He suffered "countless head injuries," including being hit by the butt of a

3    gun when he was three and being involved in a serious motorcycle accident. (*Id.*)

4        Sexually inappropriate behavior was rampant in Greene's family. Greene's mother

5    was repeatedly molested by her father. (*Id.*) Greene's father was addicted to pornography

6    and wallpapered the family home with centerfolds. (*Id.*) He sexually molested his daughter.

7    (*Id.* at 93–94.)

8        Greene's childhood was lonely. (*Id.* at 93.) His family lived twenty-seven miles

9    from the nearest town and there were no other children nearby. (*Id.* at 93–94.) Greene's

10    only role model was his openly racist and homophobic father. (*Id.* at 94.) Greene was pulled

11    out of school in sixth grade and never returned. (*Id.*) His family lived in a converted bus

12    with no fixed address.

13        When Greene was thirteen or fourteen he was sexually molested by a rancher who

14    had lured Greene to his home with the offer of a job. (*Id.* at 94–95.) He performed oral sex

15    on Greene while Greene pretended to be asleep. (*Id.*)

16        At around this time, and with his mother's consent, Greene began using alcohol and

17    drugs, including hashish and LSD. (*Id.* at 95.) At age fifteen he tried cocaine for the first

18    time. (*Id.*) At seventeen he turned to methamphetamine as his drug of choice. (*Id.*) He never

19    sought treatment for his substance abuse. (*Id.*)

20        As a result of this dysfunctional background, Greene "suffered from a form of post-

21    traumatic stress disorder" as well as methamphetamine dependence and psychosis at the

22    time of the crime. (*Id.* at 96.) In support of these assertions about his mental state, Greene

23    cites the following examinations and diagnoses.[12]

24        In July 2000, PCR counsel retained Dr. Marc Walter, a neuropsychologist, to

25    evaluate Greene. (Doc. 116-1, Ex. 23.) Dr. Walter reviewed the evaluation conducted in

26    1995 by Dr. Perrin and other records and administered a battery of neuropsychological

27

28    [12] The Court previously denied Greene's motion to expand the record with these
documents. (Doc. 86.) As discussed below, the Court now grants that request.

tests. (*Id.* at 1–3.) Dr. Walter reported that Greene had been in a motorcycle accident in 1994; he lost consciousness and suffered amnesia. (*Id.* at 1.) A CAT scan was negative, however. (*Id.*) Noting that Greene's scores in several areas had improved from the testing done in 1995, Dr. Walter opined that at the time of the murder Greene was probably "much more impaired neurocognitively both as a result of his extensive history of drug and alcohol abuse as well as his intoxication/sleep withdrawal status."[13] (*Id.* At 4.) He further opined that had "a neuropsychological evaluation been conducted even as late as several months after [Greene's] arrest . . . , significant impairment in a variety of neurocognitive areas of function would have been noted." (*Id.*) Dr. Walter found that "Greene's description of hallucinations during the offense is consistent with his history of methamphetamine abuse, sleep deprivation, and starting to go into withdrawal from the drug." (*Id.*) He concluded that "Greene's brain was in an abnormal state at the time of the offense" and that Greene "would have difficulty distinguishing what was real and what was hallucinatory and his judgment would have been extremely compromised." (*Id.*)

Dr. Craig Beaver, a neuropsychologist, evaluated Greene in 2004 during these habeas proceedings. (Doc. 116-1, Ex. 24.) Dr. Beaver reviewed records and administered a battery of neuropsychological tests. (*Id.* at 2.) He also noted Greene's 1994 motorcycle accident. Dr. Beaver found three areas of significance with respect to Greene's state of mind at the time of the murder: his prior history of sexual abuse and his father's negative views about homosexuality; withdrawal from methamphetamine; and use of methamphetamine, sleep deprivation, and lack of food in the days leading up to the crime. (*Id.* at 6.) Dr. Beaver opined that at the time of the crime Greene was experiencing drug-induced psychosis, including hallucinations and paranoia. (*Id.* at 11.) According to Dr. Beaver, Greene was "neurocognitively impaired . . . from his methamphetamine use and sleep deprevation [sic]." (*Id.* at 11.) This impairment "resulted in heightened arousal,

---

[13] Dr. Perrin determined that Greene's full-scale IQ was 113. (Doc. 116-1, Ex. 23 at 1.) According to Dr. Walter, Dr. Perrin did not perform a "formal neuropsychological evaluation" of Greene. (*Id.*)

producing strong reactions . . . [and] decreased [Greene's] control over emotional responses, impulses and behaviors because of methamphetamine [sic] effect on the frontal lobes." (*Id.*) Dr. Beaver noted, however, that his neuropsychometric testing, like the testing done previously by Drs. Perrin and Walter, "did not find evidence of significant neurocognitive deficit." (*Id.*)

Greene was also evaluated by Dr. Donna Schwartz-Watts, a psychiatrist retained by federal habeas counsel. (Doc. 116-1, Ex. 25.) Dr. Schwartz-Watts reviewed background materials, evaluated Greene, and interviewed his relatives and an ex-girlfriend. (*Id.* at 8.) She diagnosed Greene with chronic Post-Traumatic Stress Disorder ("PTSD"), arising from the incident when Greene was molested as a teenager. (*Id.* at 4.) She also diagnosed him with Amphetamine Dependence, with Physiological Dependence, and with a history of Amphetamine Induced Psychotic Disorder, with Hallucinations, and with Onset During Withdrawal. (*Id.* at 14.) Dr. Schwartz-Watts also reported that Greene, according to his father, was exposed to Agent Orange and other toxins at Greene's childhood home, which was located near a chemical dump. (*Id.* at 3.) She stated, however, that "[t]he effects of such exposure on Beau Greene are not known at this time." (*Id.*)

Finally, Dr. Schwartz-Watts noted that both Dr. Perrin and Dr. Walter failed to diagnose Greene with PTSD. (*Id.* at 10–11.) According to Dr. Schwartz-Watts, Dr. Perrin erred by interpreting psychological test results as representing a personality disorder rather than "the effects of abuse" and Dr. Walter failed to consider the visual hallucinations described by Greene as "a symptom" of PTSD. (*Id.*)

a.     "Prejudice" under *Martinez*

The Court finds that Claim 4(C)(1) meets the standard for being "substantial" under *Martinez*. The Court cannot say the claim "does not have any merit" or is "wholly without factual support." *Martinez*, 566 U.S. at 14–16. Because the claim is "substantial," *Martinez*'s "prejudice" prong is satisfied.

As noted above, however, a finding of "prejudice" for purposes of the "cause and prejudice" analysis "does not diminish the requirement . . . that petitioner satisfy the

'prejudice' prong under *Strickland* in establishing ineffective assistance by post-conviction counsel." *Clabourne*, 745 F.3d at 377. The Court will now consider whether "cause" for the claim's default exists.

b.     "Cause" under *Martinez*

To establish "cause," Greene must demonstrate that PCR counsel performed ineffectively in failing to raise Claim 4(C)(1). To make that showing he must establish that PCR counsel performed deficiently by failing to raise the claim and that there was a reasonable probability that the result of the PCR proceedings would have been different if the claim had been raised. *Clabourne*, 745 F.3d at 377.

In considering whether PCR counsel's performance was ineffective, the Court will focus on the prejudice prong. *See Strickland*, 466 U.S. at 697 ("If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed."). Thus, the Court makes no determination as to whether PCR counsel performed deficiently in failing to raise the underlying claim of ineffective assistance of counsel at sentencing. To determine whether PCR counsel's performance was ineffective, the court evaluates the strength of the underlying claim of ineffective assistance of trial counsel. *See Hooper*, 985 F.3d at 627; *Atwood*, 870 F.3d at 1059–60; *Runningeagle*, 825 F.3d at 982.

The Court concludes that Greene was not prejudiced by PCR counsel's failure to raise Claim 4(C)(1) because the underlying claim lacks merit. In determining the strength of the claim of ineffective assistance of counsel at sentencing, the Court again focuses primarily on *Strickland*'s prejudice prong. *See Hooper*, 985 F.3d at 627 ("Even assuming [counsel] performed deficiently by failing to investigate and present mitigation evidence (a question we need not and do not reach), we find there is no 'reasonable probability that, but for [counsel's alleged] unprofessional errors, the result of the proceeding would have been different.'") (quoting *Strickland*, 466 U.S. at 694).

To assess prejudice from counsel's performance at the sentencing stage of a capital case, a court considers the totality of the mitigating evidence and weighs it against the

aggravating factors. *Wiggins*, 539 U.S. at 534. This Court, after performing such an assessment of the totality of Greene's mitigating evidence, including the evidence raised during these habeas proceedings, concludes that Greene was not prejudiced by counsel's failure to present additional information about his background at sentencing.

First, much of the lay evidence described above was in fact presented at sentencing through the testimony of Greene's family members, Greene's trial testimony, and in Greene's social history interview with counsel. The sentencing court was made aware of Greene's isolated and unsettled childhood, his early withdrawal from school, and the negative influence of his mother and father. The evidence also documented Greene's long history of drug abuse.

In his interview with Thorpe, Greene discussed in detail his molestation by a stranger at age thirteen or fourteen and his father's molestation of his sister. Thorpe argued that these incidents constituted mitigating circumstances. In particular, counsel argued that the prior incident of sexual abuse was present in Greene's mind and affected his behavior, causing him to "freak out" when Johnson propositioned him and touched his leg. The court was also aware, from Greene's own testimony, that at the time of the murder he was hallucinating from methamphetamine withdrawal and felt like he was "somewhere else."

The largely cumulative nature of the evidence offered about Greene's background diminishes the likelihood of prejudice. *See Leavitt v. Arave*, 646 F.3d 605, 615 (9th Cir. 2011) ("[C]umulative evidence is given less weight because it is not as likely to have affected the outcome of the sentencing."); *Rhoades*, 638 F.3d at 1051 (finding no prejudice despite the fact that new evidence "exceed[ed] what was uncovered and presented by trial counsel" in part because "much of the newly adduced evidence is cumulative").

Greene has now offered additional information about sexually inappropriate behavior in his extended family, as well as evidence of a head injury and possible childhood exposure to toxic chemicals. He also offers the PTSD diagnosis reached by Dr. Schwartz-

Watts.[14] The Court finds that Greene was not prejudiced by the omission of this evidence at sentencing.

The *weight* of Greene's mitigation evidence is reduced because of its lack of a causal connection to the murder.[15] For example, Arizona courts have assigned less weight to a PTSD diagnosis when the defendant fails to show a link between the condition and his conduct in committing the murder. *See State v. Hedlund*, 245 Ariz. 467, 473, 431 P.3d 181, 187 (2018) (giving PTSD diagnosis little weight where the evidence failed to showed that petitioner "could not appreciate right from wrong or conform his conduct to the requirements of law"); *State v. Hidalgo*, 241 Ariz. 543, 558, 390 P.3d 783, 798 (2017) (reducing weight of PTSD and other diagnoses where petitioner "understood the wrongfulness of his actions" and no connection was drawn between mitigating circumstances and murders); *State v. Styers*, 227 Ariz. 186, 189, 254 P.3d 1132, 1135 (2011) (reducing weight of PTSD as mitigating factor where no connection was shown to crime).

Greene's conduct in committing the murder and his behavior afterwards do not support a finding that he was impaired by PTSD or any other condition. Evidence showed that the murder was premeditated, with Greene arming himself before attacking the victim, and carried out for the purpose of obtaining funds to buy drugs. Immediately after the murder, Greene took the victim's vehicle, cash, and credit cards, and went on a spending

---

[14] Trial counsel did not perform deficiently with respect to the PTSD diagnosis. They retained three experts to evaluate Greene—Drs. Perrin, Kanof, and Boyer—none of whom reached the diagnosis now offered by Dr. Schwartz-Watts; nor did Dr. Walter, who evaluated Greene during the PCR proceedings. Counsel cannot be faulted for failing to present evidence of PTSD when their experts did not reach such a diagnosis. "Attorneys are entitled to rely on the opinions of properly selected, adequately informed and well-qualified experts." *Crittenden v. Ayers*, 624 F.3d 943, 966 (9th Cir. 2010); s*ee Brown v. Uttecht*, 530 F.3d 1031, 1035 (9th Cir. 2008).

[15] As discussed below, under the Ninth Circuit's analysis in *McKinney*, 813 F.3d 798, the Arizona Supreme Court applied an unconstitutional nexus test to Greene's mitigating evidence by assigning it *no* weight. It is permissible, however, for a court to reduce the weight of a mitigating circumstance when it is not causally related to the murder, or when the causal link is weak. *See Lopez*, 630 F.3d at 1204.

spree, all while making efforts to avoid detection and facilitate an escape. Greene's trial testimony demonstrated—contrary to his claims that he "freaked out" and was hallucinating—that he had no difficulty recalling the details of his conduct before, during, and after the crime. As the Arizona Supreme Court explained in rejecting the (G)(1) "impaired capacity" mitigating circumstance:

> Greene's behavior shows that he did appreciate the wrongfulness of his conduct. After the murder, Greene asked Bevan for clean pants and shoes. Because Bevan did not have pants for him, Greene rubbed dirt on the bloodstains, "trying to be as inconspicuous as possible." Greene also took a small rug to cover the bloody car seats. In addition, he feigned injury to his hand in order to use Johnson's stolen credit cards. We agree with the trial court that the evidence is insufficient to establish the existence of the (G)(1) mitigating circumstance.

*Greene*, 192 Ariz. at 441–42, 967 P.2d at 116–17 (citation omitted); *see State v. Rienhardt*, 190 Ariz. 579, 591–92, 951 P.2d 454, 466–67 (1997) ("[A] defendants claim of alcohol or drug impairment fails when . . . the defendant took steps to avoid prosecution shortly after the murder, or when it appears that intoxication did not overwhelm the defendant's ability to control his physical behavior."); *State v. Poyson*, 250 Ariz. 48, 475 P.3d 293, 298 (2020) ("We will not find that a defendant's ability to conform or appreciate the wrongfulness of his conduct was impaired when the defendant's actions were planned and deliberate, or when the defendant seeks to cover up his crime.").

The Ninth Circuit has likewise found prejudice lacking where the circumstances of the crime are not consistent with a proposed mental health mitigating circumstance. *See Boyer v. Chappell*, 793 F.3d 1092, 1105 (9th Cir. 2015) (finding petitioner did not establish prejudice from trial counsel's failure to investigate and present evidence of organic brain damage because evidence suggested the petitioner was in search of money when he committed the crimes and that he took actions after the crimes "to avoid arousing suspicion"); *Rhoades*, 638 F.3d at 1050 (finding no ineffective assistance for failing to present evidence of PTSD because, in part, there was "no suggestion" that the petitioner committed the crime "while in any kind of a PTSD-induced disassociative state").

In addition, Dr. Schwartz-Watts's PTSD diagnosis was based on the incident in which the teenaged Greene was molested by a male adult stranger. The court was aware of

the incident, and aware also of counsel's argument that Greene's violent, impulsive response to the victim's sexual advance was partly the product of Greene's previous experience as a sexual abuse victim. With that evidence before the court at sentencing, the absence of the actual PTSD diagnosis was less likely to be prejudicial. Any link between the prior incident and Greene's alleged reaction to the victim's conduct was not so "esoteric" as to be beyond the court's understanding in the absence of expert testimony. *See Raley*, 470 F.3d at 803.

Dr. Schwartz-Watts attempted to draw a causal connection between Greene's PTSD and his conduct in committing the murder. (Doc. 116-1, Ex. 25 at 5.) She opined that Greene was re-experiencing his earlier sexual abuse when he "flew into a rage" after Johnson touched his leg, and began "pummeling [Johnson] with his fists." (*Id.*) This opinion, however, is based on Greene's trial testimony, which did not accurately describe the attack and omitted the fact that Greene took the time to arm himself with the sap glove before he began beating the victim. Here again, the record does not support a connection between Greene's PTSD and the crimes.

The totality of the mitigation offered by Greene also includes evidence of a dysfunctional family life. As already noted, much of this evidence was presented at sentencing. The additional background information is not entitled to significant weight.

Under Arizona law, a "difficult or traumatic childhood is a mitigating circumstance." *State v. Prince*, 226 Ariz. 516, 541, 250 P.3d 1145, 1170 (2011). "Although the defendant need not prove a causal nexus between the mitigating circumstance and the crime, the lack of such a connection may lessen the mitigation's weight." *Id.*; *see Poyson*, 250 Ariz. 48, 475 P.3d at 300 ("The mitigating weight of childhood abuse is . . . reduced when there is no causal link between the abuse and the murder."); *see State v. Mann*, 188 Ariz. 220, 231, 934 P.2d 784, 795 (1997) ("An abusive family background is usually given significant weight as a mitigating factor only when the abuse affected the defendant's behavior at the time of the crime.") In Greene's case, the causal connection between his dysfunctional childhood and the crime is attenuated both by the evidence showing that he

1    premeditated the murder and intended to rob Johnson and by the evidence demonstrating

2    that he appreciated the wrongfulness of his conduct.

3        In addition, "[t]he mitigating weight of childhood abuse may diminish as a

4    defendant ages." *Poyson*, 250 Ariz. 48, 475 P.3d at 300 (citing *Hidalgo*, 241 Ariz. at 558,

5    390 P.3d at 798); *see Prince*, 226 Ariz. at 541, 250 P.3d at 1170 ("Difficult childhood

6    circumstances . . . receive less weight as more time passes between the defendant's

7    childhood and the offense."); *State v. Hampton*, 213 Ariz. 167, 185, 140 P.3d 950, 968

8    (2006) (explaining that the relevance of "horrendous" childhood lessened where defendant

9    was thirty years old at time of the murder); *State v. Pandeli*, 215 Ariz. 514, 532, 161 P.3d

10   557, 575 (2007) ("Pandeli murdered [the victim] when he was in his late twenties, reducing

11   the relevance of his traumatic childhood.").

12       Greene was twenty-nine years old when he murdered Professor Johnson, and

13   significantly distanced from his dysfunctional childhood. As the Arizona Supreme Court

14   noted, "he had had little or no contact with his mother in years." *Greene*, 192 Ariz. at 442,

15   967 P.2d at 117. After leaving home Greene had worked several jobs, obtained his GED

16   and become certified as a motorcycle mechanic; he had married and fathered children. He

17   did not engage in any violent behavior, despite his ongoing drug use and whatever mental

18   health conditions he may have suffered from. *See State v. McGill*, 213 Ariz. 147, 161, 140

19   P.3d 930, 944 (2006) ("[T]he impact of McGill's upbringing on his choices has become

20   attenuated during the two decades between his reaching adulthood and committing this

21   murder."); *State v. Ellison*, 213 Ariz. 116, 144, 140 P.3d 899, 927 (2006) (finding, where

22   there was no evidence defendant did not know right from wrong, "childhood troubles

23   deserve little value as a mitigator for the murders he committed at age thirty-three"). The

24   mitigating weight of Greene's dysfunctional childhood is reduced by its distance in time

25   from the murder.

26       Finally, with respect to the new evidence of head injuries and childhood exposure

27   to toxic chemicals, there is not enough information in the record for the Court to conclude

28   that Greene has met his burden of showing he was prejudiced by counsel's failure to present

this information at sentencing. There is no evidence, for example, that Greene suffered any effects from the head injury or his alleged exposure to toxins. A CAT scan after the motorcycle accident was negative, and Dr. Schwartz-Watts acknowledged that if Greene had been exposed to toxins the effect of such exposure was unknown. Speculation that Greene was affected neurologically by these circumstances is insufficient to establish prejudice. *See Djerf v. Ryan*, 931 F.3d 870, 883 (9th Cir. 2019) (finding no prejudice where it was "not clear" what new evidence counsel could have uncovered regarding defendant's purported head injury and explaining "such speculation rarely creates a 'reasonable probability' that a different result would have occurred absent the purportedly deficient representation") (quoting *Strickland*, 466 U.S. at 694).

This is not a case where the court sentenced Greene to death "knowing hardly anything about him." *Andrews v. Davis*, 944 F.3d 1092, 1117 (9th Cir. 2019) (quoting *Porter v. McCollum*, 558 U.S. 30, 33 (2009)). Greene cites *Porter*, where the Supreme Court found prejudice based on counsel's failure to present evidence of the defendant's "abusive childhood, his heroic military service and the trauma he suffered because of it, his long-term substance abuse, and his impaired mental health and mental capacity." 558 U.S. at 33.

*Porter* is distinguishable. There, "[t]he sum total of the mitigating evidence was inconsistent testimony about Porter's behavior when intoxicated and testimony that Porter had a good relationship with his son." *Id.* at 32. Greene's counsel, by contrast, did present mitigating evidence of his dysfunctional childhood and the negative influence of his parents, his long-term substance abuse, the withdrawal symptoms he was experiencing during the attack, and the sexual molestation he experienced as a teenager. There was no heroic military service to report, but counsel offered humanizing testimony about Greene's good qualities and the positive aspects of his background. The trial court agreed that Greene's substance abuse history and withdrawal, together with his lack of a felony record, were mitigating circumstances. *Cf. Rhoades*, 638 F.3d at 1051 (finding no prejudice where trial court was presented with evidence of defendant's drug abuse history, childhood health

problems, limited education, and redeeming qualities). The omitted evidence of PTSD, for the reasons discussed above, was not weighty enough to result in prejudice. *See Payton v. Cullen*, 658 F.3d 890, 895 (9th Cir. 2011) (finding petitioner was not prejudiced where omitted evidence of childhood "experience is not comparable to those in other cases where courts have found a reasonable probability that the outcome would have been different").

Greene was not prejudiced by counsel's failure to present additional background evidence. The difference between the evidence that was presented and the evidence that could have been presented is insufficient to undermine confidence in the outcome of the sentencing proceedings. *Duncan*, 528 F.3d at 1240; *see also Atwood*, 870 F.3d at 1064; *Runningeagle*, 825 F.3d at 988. The omitted evidence "would barely have altered the sentencing profile presented to the sentencing judge." *Strickland*, 466 U.S. at 699–700. There was not a reasonable probability that Greene would have received a life sentence if the evidence had been presented. *Strickland*, 466 U.S. at 693.

PCR counsel, in turn, did not perform ineffectively by failing to raise this claim. *See Atwood*, 870 F.3d at 1060 ("If the ineffective assistance of trial counsel claim lacks merit, then the state habeas counsel would not have been deficient for failing to raise it."); *Runningeagle*, 825 F.3d at 982 (explaining that to find prejudice based on PCR counsel's failure to raise a trial-level ineffective assistance of counsel claim, the court "must also find a reasonable probability that the trial-level IAC claim would have succeeded had it been raised"). There is not a reasonable probability that the results of the PCR proceedings would have been different if counsel had raised this claim. Greene therefore cannot show "cause" under *Martinez* for the claim's default. Claim 4(C)(1) remains procedurally defaulted and barred from federal review.

### 3.      Claim 4(C)(2)

In Claim 4(C)(2) of his amended petition, Greene alleged that trial counsel performed ineffectively at sentencing by failing to rebut the pecuniary gain aggravating factor with evidence of the victim's homosexuality.[16] (Doc. 82-4 at 86–87.) He asserted

---

[16] In Claim 4(B) of his amended habeas petition, Greene alleged that counsel performed

that "[t]rial counsel was on notice that the information that Johnson was gay was available" but "failed to investigate this issue." (*Id.* at 87.) According to Greene, additional investigation, including interviewing people at the School of Music, would have revealed that it "was common knowledge . . . that Johnson would go out late at night to pick up males for sex." (*Id.* at 93.)

Greene contends that evidence suggesting Johnson was homosexual was available to trial counsel from several sources. First, in an anonymous letter to Thorpe, dated August 27, 1996, the writer stated that according to two reliable sources—a student and a member of Johnson's church choir—Johnson was sexually active with other men. (*See* Doc. 117, Ex. 48.) Defense counsel did not follow up on that information.

Next, there was a phone call to the prosecutor during the trial. Because he did not want to become a witness, the prosecutor handed the phone to his detective, who took notes on the conversation. The anonymous caller told the detective that she worked for the university and knew that Johnson was gay. (*See* RT 3/13/96 at 75–77.) The caller also made "unflattering comments" about Johnson's wife, S.J. (*Id.* at 79.) The prosecutor informed the court and defense counsel of the call but did not turn over the notes taken by the detective, and counsel did not request them. (*See* Doc. 116-1, Ex. 1, ¶ 5.)

Later that day, S.J.'s secretary approached the court with information that S.J. had checked out books about homosexuality and bisexuality from the University library. (RT 3/13/96 at 211–14.) The next day, defense counsel called S.J. to the stand. She repeated her previous testimony that her husband was "a man of great honor and integrity," that he was "completely devoted" to her, and that there were "no secrets between" them. (RT 3/14/96 at 9–10.) She acknowledged checking out books about homosexuality, bisexuality, and husbands coming out of the closet. (*Id.* at 10–11.) She testified that given the accusations about her husband, checking out the books and trying to gain more information

---

ineffectively by failing to move to vacate the verdict after the testimony of Galvaz and Schmitz. The Court found that the PCR court reasonably denied this claim (Doc. 93 at 13–14.)

1    "seemed the sensible thing to do." (*Id.* at 13.) She did not read the books, however. (*Id.*)

2    Defense counsel did not pursue the issue further. (Doc. 116-1, Ex. 1, ¶ 4.)

3          In his habeas petition Greene also noted information provided by Frederick Moyer,

4    a concert pianist who traveled to Tucson for a concert in March 1996. (Doc. 82 at 15.)

5    Moyer reported that he was told by a School of Music employee that it was "common

6    knowledge" Johnson would go out late at night to pick up men for sex. (*Id.*; *see* Doc. 116-

7    1, Ex. 22, ¶ 4.) Moyer stated that he urged the employee to come forward, but she refused.

8    (*Id.* at 16; Doc 116-1, Ex. 22, ¶ 6.) Moyer eventually relayed this information to Greene's

9    appellate and PCR lawyers, but they did not make use of it. (*Id.*; Doc. 116-1, Ex. 22, ¶¶ 9–

10   15.)

11         During these habeas proceedings, Greene has identified two additional witnesses to

12   support his claim that Johnson was homosexual. John Fessel is a Tucson resident who

13   stated, in a declaration dated September 15, 2005, that he had a sexual encounter with

14   Johnson in January or February 1995. (Doc. 116-1, Ex, 20.) Kim Hyashi, a student at the

15   School of Music, stated in a declaration dated September 27, 2005, that Johnson had a

16   reputation for "cruising" at a park near the University. (Doc. 116-1, Ex. 21.)

17         In alleging that counsel performed ineffectively by failing to question the victim's

18   sexuality, Greene also cites evidence of an affair between Robert Sankey and S.J. (*See* Doc.

19   116 at 51.) The affair only came to light during the PCR proceedings. (*See* Doc. 116-1, Ex.

20   1, ¶ 7.) According to Greene, evidence of the affair would have impeached the credibility

21   of both S.J. and Sankey.

22         Greene cannot establish that trial counsel performed ineffectively by failing to

23   present evidence of Johnson's homosexuality. Their performance was neither deficient nor

24   prejudicial.

25         First, counsel did present such evidence at the sentencing stage of trial. As already

26   noted, Galvaz and Schmitz testified to that effect.

27         More significantly, overwhelming evidence supported the finding that the murder

28   was committed for pecuniary gain, and such evidence would not have been affected by

evidence showing that Johnson was gay and solicited sex from strangers. As the trial court explained, Greene's version of the killing—that he struck the victim with his bare hand— was "destroyed" by the medical examiner's testimony. (Doc. 135-2, Ex. C, ME 8/26/96, at 1.) The court found that Greene "had to have made a conscious deliberate effort to use an instrument for the purposes of beating the victim in order to cause the injuries suffered by Roy Johnson." (*Id.*) According to the court, because Greene purposely donned the sap glove, "it is unreasonable and flies in the face of logic to believe that this murder was motivated by rage." (*Id.*) The court concluded that "the only motivation proven beyond a reasonable doubt is that Roy Johnson's murder was for pecuniary gain." (*Id.*)

The court further noted that the trial evidence contradicted Greene's testimony that he formed the intent to take the victim's wallet and vehicle only after the killing. (*Id.*) The evidence showed just one set of footprints leading to the body, refuting Greene's testimony that he returned later to take Johnson's wallet. (*Id.* at 1–2.)

The court concluded that "the clear implication of the evidence is that the defendant formed the intent to profit from the murder no later than the moment when he picked up the object he used to bludgeon Roy Johnson. This evidence is not reasonably susceptible to any other interpretation." (*Id.*) Accordingly, the court found that the murder was committed in the expectation of pecuniary gain. (*Id.*)

The Arizona Supreme Court agreed, citing Greene's use of a weapon, which implied premeditation, and the single set of tracks. *Greene*, 192 Ariz. at 439, 967 P.2d at 114. The court continued:

> The trial court's finding that Greene intended to profit from the murder was also supported by Greene's admitted need for money, drugs, and transportation. Greene testified that he was hungry, tired, and craving methamphetamine when he encountered Johnson. He was homeless, had no transportation, and was attempting to avoid a drug dealer who had threatened to shoot him over an outstanding debt. Greene testified that the two most important things in his life at the time were to get more drugs and to win back his girlfriend.
>
> Greene's actions after the murder also demonstrate a pecuniary motive. Driving Johnson's car, and within hours of the murder, Greene began using Johnson's credit cards. Greene wrapped his hand in K-Y jelly and gauze and feigned injury to explain any discrepancy in credit card signatures. With the stolen credit cards, he purchased camping equipment, food, and electronic

equipment that he later traded for drugs. He also bought food and took it to his girlfriend's house for her son.

Greene argues the court failed to properly consider the effect of his methamphetamine use on his ability to accurately perceive and recall the events that night. But if Greene's memory is suspect, all that remains is uncontradicted evidence offered by the state. Moreover, during trial, Greene recalled, in great detail, events both before and after the murder. On cross examination, he stated unequivocally that neither usage nor withdrawal from methamphetamine had ever affected his memory.

We have held that when one comes to rob, the accused expects pecuniary gain and this desire infects all other conduct. . . . The evidence supports beyond a reasonable doubt a finding that Greene, coming off of methamphetamine and penniless, killed Johnson to obtain cash or credit cards so that he could make fraudulent purchases to exchange for money or drugs. Thus, the trial court found that Greene's admitted need for money, drugs, and transportation in combination with the crime scene evidence showed that Greene intended to profit from the murder no later than the moment he picked up the object to kill Johnson. We agree. Greene murdered Johnson for pecuniary gain.

*Id.* (citation omitted).

Evidence that Johnson was gay—with the implication that therefore he might have made a sexual advance on Greene—or that Johnson's wife was unfaithful, would not have changed the fact that Greene armed himself before attacking Johnson, then stole his wallet and vehicle and used his cash and credit cards to purchase items he could exchange for money or drugs or use in his attempt to evade capture. There was not a reasonable probability of a different verdict if further evidence of Johnson's homosexuality or evidence of his wife's unfaithfulness had been presented.

Trial counsel did not perform ineffectively in failing to rebut the pecuniary gain aggravating factor by presenting additional evidence of Johnson's homosexuality. PCR counsel, in turn, did not perform ineffectively by failing to raise this meritless claim. *See Atwood*, 870 F.3d at 1059–60; *Runningeagle*, 825 F.3d at 982; *Hooper*, 985 F.3d at 627. Therefore, cause does not exist under *Martinez* for the claim's default and the claim remains barred from federal review.

### 4.    Claim 5

In Claim 5 of his amended petition, Greene alleged that his rights were violated by a conflict of interest arising from counsel's advice to testify falsely. (Doc. 82-5 at 98.)

According to Greene, counsel's decision to offer Greene's testimony that he hit the victim only with his fist destroyed Greene's credibility and prevented counsel from presenting the testimony of Dr. Kanof. (*Id.*) This Court previously found the claim defaulted and barred from review. (Doc. 86 at 19–20.) As noted above, however, under *Pizzuto* the Court may consider whether cause and prejudice exist to excuse the claim's default. Because the underlying claim is meritless, the default is not excused.

The right to counsel guaranteed by the Sixth Amendment includes the "right to representation that is free from conflicts of interest." *Wood v. Georgia*, 450 U.S. 261, 271 (1981). An ineffective assistance of counsel claim based on a conflict of interest requires a petitioner to show "that an actual conflict of interest adversely affected his lawyer's performance." *Cuyler v. Sullivan*, 446 U.S. 335, 350 (1980). "[U]ntil a defendant shows that his counsel actively represented conflicting interests, he has not established the constitutional predicate for his claim of ineffective assistance." *Id.* In the conflict of interest context, prejudice is presumed if a petitioner shows that his lawyer labored under an actual conflict of interest. *United States v. Rodrigues*, 347 F.3d 818, 823 (9th Cir. 2003) (citing *Sullivan*, 446 U.S. at 347). An "actual conflict of interest" means "a conflict *that affected counsel's performance*—as opposed to a mere theoretical division of loyalties." *Mickens v. Taylor*, 535 U.S. 162, 171 (2002) (emphasis in original).

In *Mickens*, "the Supreme Court explicitly limited this presumption of prejudice for an actual conflict of interest . . . to cases involving 'concurrent representation'"—that is, simultaneous representation of two or more defendants. *Rowland v. Chappell*, 876 F.3d 1174, 1192 (9th Cir. 2017) (citing *Mickens*, 535 U.S. at 175); *see Earp v. Ornoski*, 431 F.3d 1158, 1184 (9th Cir. 2005) ("The *Mickens* Court specifically and explicitly concluded that *Sullivan* was limited to joint representation. . . . "). The presumption of prejudice is needed in cases of concurrent representation because of "the high probability of prejudice arising from multiple concurrent representation, and the difficulty of proving that prejudice." *Mickens*, 535 U.S. at 175; *see Rowland*, 876 F.3d at 1192. However, "[n]ot all attorney conflicts present comparable difficulties," and the *Mickens* Court criticized circuit

1    courts for applying "*Sullivan* 'unblinkingly' to 'all kinds of alleged attorney ethical

2

3    conflicts,'" including cases involving personal or financial interests. *Mickens*, 535 U.S. at

174 (citation omitted); *see Rowland*, 876 F.3d at 1192.

4          Because the alleged conflict of interest here does not involve concurrent

5

6    representation, *Sullivan* does not apply. Greene cannot show an actual conflict of interest

that would lead to a presumption of prejudice. Accordingly, to be entitled to relief on this

7    claim, Greene must demonstrate prejudice under *Strickland. See, e.g.*, *Rodrigues*, 347 F.3d

8    at 823; *United States v. Walter-Eze*, 869 F.3d 891, 900 (9th Cir. 2017) (explaining that

9    *Strickland* analysis applies in the absence of an actual conflict under *Sullivan*). He cannot

10   make that showing.

11          In Claim 4(A), Greene alleged in part that counsel performed ineffectively at the

12   guilt phase of trial by advising him to testify untruthfully about the manner in which he

13   killed the victim. (Doc. 82 at 72–76.) Because this claim was raised and denied during the

14   PCR proceedings, the Court addressed it on the merits, concluding that the PCR court's

15   ruling was not based on an unreasonable application of *Strickland*. (Doc. 93 at 11.)

16          The PCR court rejected Greene's claim that counsel performed ineffectively by

17   presenting his testimony at trial, finding that Greene suffered no prejudice. The court noted

18   that Greene's own *Strickland* expert testified there was no reasonable probability of a

19   different verdict if Greene had not testified. (Doc. 121-1, Ex. C, ME 1/10/03.) The court

20   then explained:

21

22       The basic problem with Defendant's argument is its logic. A defendant who
falsely claims to have killed a victim in a rage does not thereby provide a
jury with sufficient evidence to convict him of killing with premeditation.

23       Such a conviction must be established, as it was in this case, by evidence
other than that of the Defendant's lies. Accordingly, the Court finds that

24       Defendant's false testimony played no role in his convictions.

25       Similarly, his false testimony did not influence the Court's sentencing
decisions. . . . The Court arrived at its decision to sentence Defendant to death

26       based solely on the aggravating and mitigating evidence. Defendant's
untruthful testimony neither established aggravation nor rebutted mitigation.

27       Accordingly, the Court finds that Defendant's false testimony played no role
in its choice of sentences.

28       . . . Defendant argues that his trial counsel was ineffective for even calling
him to testify. . . . As noted above, the Court finds no connection between

1
2
3

Defendant's untruthful testimony and his convictions and sentence. He thus fails to prove that he was prejudiced by his decision to testify. In any event, the decision to testify was his, not his counsel's, though the decision was made with counsel's advice.

(*Id.* at 3–4.)

In reviewing the PCR court's decision, this Court agreed that Greene's testimony did not prejudice him at either the guilt or the penalty stages of trial. (Doc. 93 at 11.) There was not a reasonable probability of a different verdict if Greene had testified truthfully about the weapon he used to kill the victim or if he had remained silent and left uncontested the evidence suggesting he acted with premeditation and for pecuniary gain. (*Id.*) Without Greene's testimony, the jury would have been left with no information about his condition at the time of the crime, including the fact that he was suffering the effects of withdrawal following a days-long methamphetamine binge. (*Id.*)

In sum, even if there were a conflict of interest, Greene was not prejudiced by counsel's decision to present his testimony. The case against him was strong; he admitted he killed the victim, so the only remaining issues were whether the killing was premeditated and whether it was carried out for pecuniary gain. Greene's testimony was the only evidence addressing either of those issues; without it, the jury and the court were left only with the version of the crime supported by the State's evidence. Greene was not prejudiced by the alleged conflict of interest.

PCR counsel did not perform ineffectively by failing to raise this meritless conflict of interest claim. *See Atwood*, 870 F.3d at 1059–60; *Runningeagle*, 825 F.3d at 982; *Hooper*, 985 F.3d at 627. Cause for the claim's default is therefore absent and the claim remains defaulted and barred from federal review.

5.   Conclusion

The default of the claims remanded pursuant to *Martinez* is not excused. Because the underlying claims are meritless, PCR counsel did not perform ineffectively in failing to raise them. Therefore, cause for their default does not exist. That determination does not change even when all of Greene's claims of ineffective assistance of counsel, including the exhausted claims that the Court already denied on the merits, are accumulated.

1

### D.     Evidentiary Development

2        As noted above, a petitioner may present evidence in support of his argument that

3   "cause" and "prejudice" exist under *Martinez* to excuse the default of a claim of ineffective

4   assistance of trial counsel. *Dickens*, 740 F.3d at 1321; *see Woods*, 764 F.3d at 1138 n.16.

5        Greene asks the Court to expand the record to include the exhibits attached to his

6   supplemental *Martinez* brief. (Doc. 116 at 119–21, 126–30, 132–41.) The Court will grant

7   that request and expand the record to includes Exhibits 1–54 (Docs. 116–118).

8        Greene also seeks discovery and an evidentiary hearing. (Doc. 116 at 118–45.) The

9   Court will deny these requests. Expansion of the record provides sufficient evidence for

10  the Court to undertake its analysis under *Martinez. See Phillips v. Ornoski*, 673 F.3d 1168,

11  1179 (9th Cir. 2012) (explaining that a court has the discretion to deny an evidentiary

12  hearing where the documentary evidence is sufficient to decide the issue).

13       The expanded record includes declarations and reports from all the named witnesses

14  Greene seeks to depose and to call at a hearing. The Court has accepted as true the contents

15  of those documents, including the experts' diagnoses. Greene has not alleged that the

16  testimony of any live witness would differ from the contents of their declarations. *See*

17  *Runningeagle*, 825 F.3d at 990 (concluding that the district court did not abuse its

18  discretion in denying an evidentiary hearing where "[t]he expanded record included the

19  declarations of witnesses who would testify at a live hearing, and [the petitioner] made no

20  showing that their testimony would differ materially from their declarations"); *Williams v.*

21  *Woodford*, 384 F.3d 567, 591 (9th Cir. 2004) (explaining that "oral testimony and cross-

22  examination were not necessary because the documentary evidence submitted fully

23  presented the relevant facts."); *Hooper*, 985 F.3d at 632–33 ("Because Hooper fails to show

24  what additional evidence he could have obtained from discovery or an evidentiary hearing

25  to support that he was prejudiced by [trial counsel's] performance, the district court did not

26  abuse its discretion in denying his requests for discovery and an evidentiary hearing.").

27       Greene's request for evidentiary development is therefore granted in part and denied

28  in part.

1    **II.    _McKinney_ Remand**

2        In _McKinney_, the Ninth Circuit held that the Arizona Supreme Court, for a period

3    of more than 15 years, violated _Eddings_ in its capital sentencing analysis by requiring a

4    defendant to show a causal nexus between his proffered mitigating evidence and the crime.

5    _McKinney_, 813 F.3d at 802.[17] On December 12, 2016, the Ninth Circuit expanded the

6    remand in this case to include the impact of _McKinney_ on Greene's habeas petition. (Doc.

7    128.)

8        **A.    Applicable law**

9        A sentencer may not "refuse to consider, _as a matter of law_, any relevant mitigating

10   evidence." _Eddings_, 455 U.S. at 114 (emphasis in original); _see Lockett v. Ohio_, 438 U.S.

11   586, 604 (1978). Applying _Lockett_ and _Eddings_, the Supreme Court has held that a state

12   cannot adopt a "causal nexus" rule—that is, a rule precluding a sentencer from considering

13   mitigating evidence unless a causal connection is established between the evidence and the

14   murder. _Tennard v. Dretke_, 542 U.S. 274, 287 (2004). While the sentencer "may determine

15   the weight to be given relevant mitigating evidence," it "may not give it no weight by

16   excluding such evidence from [its] consideration." _Eddings_, 455 U.S. at 114–15. The

17   sentencer may, however, consider "causal nexus . . . as a factor in determining the weight

18   or significance of mitigating evidence." _Lopez v. Ryan_, 630 F.3d 1198, 1204 (9th Cir.

19   2011), _overruled on other grounds by McKinney_, 813 F.3d at 819.

20       In _McKinney_, the Ninth Circuit held that the Arizona Supreme Court, during a time-

21   period encompassing its review of Greene's case, "consistently" applied an impermissible

22   causal nexus test to mitigating evidence in capital cases. _McKinney_, 813 F.3d at 803. The

23   court explained:

24           The decisions of the Arizona Supreme Court make clear that family
             background or a mental condition could be given weight as a nonstatutory
25           mitigating factor, but only if defendant established a causal connection
             between the background or condition and his criminal behavior. For a little
26

27   _____

28   [17] From _State v. Wallace_, 160 Ariz. 424, 773 P.2d 983 (1989), to _State v. Anderson_, 210
     Ariz. 327, 111 P.3d 369 (2005). The Arizona Supreme Court reviewed Greene's sentence
     in 1998.

over fifteen years, the Arizona Supreme Court routinely articulated and insisted on its unconstitutional causal nexus test. . . .

*Id.* at 815.

**B.    Additional facts**

1.    Trial Court

The trial court at sentencing found that the State had proved two aggravating factors, that the murder was committed for pecuniary gain and that the murder was especially heinous and depraved. (Doc. 135-2, Ex. C at 1–5.) The court found that Greene had not proved any statutory mitigating circumstances. (*Id.* at 5.)

The court made the following findings with respect to Greene's nonstatutory mitigating evidence:

> [I]t is clear from the evidence that prior to the defendant's use of drugs, that he had been able to obtain an education and successfully complete a trade school so as to be able to support himself and his family. The evidence further shows that the defendant was capable through his own efforts of entering into and maintaining what could have become a good marriage and productive life.
>
> The court finds that, in his earlier life, the defendant was a positive role model and influence on his step-brother. The defendant was able to have this influence notwithstanding the fact that he had come out of his parents' dysfunctional lifestyles.
>
> The Court has considered the testimony of the defendant's ex-wife, mother of his children, who worries about her children.
>
> The Court finds the defendant's drug usage and withdrawal to be a non-statutory mitigating circumstance.
>
> The Court finds the defendant's lack of a felony record to be a non-statutory mitigating circumstance.

(*Id.* at 5–6.) The court concluded that the mitigating circumstances were not sufficient to call for leniency and sentenced Greene to death. (*Id.* at 6.)

2.    Arizona Supreme Court

In its independent review of Greene's death sentence, the Arizona Supreme Court affirmed the trial court's finding that Greene committed the murder for pecuniary gain. *Greene*, 192 Ariz. at 438–39, 967 P.2d at 113–14. The court held, however, that the trial

- 42 -

court erred in finding the murder especially heinous or depraved. *Id.* at 439–41, 967 P.2d at 114–16. Specifically, the court held that Greene's statements after the murder, while they showed Greene's "vile state of mind and callous attitude," did not establish that he relished the murder as required for the (F)(6) aggravating circumstance.[18] *Id.* at 441, 967 P.2d at 116.

Turning to the mitigating circumstances, the supreme court agreed with the trial court that Greene had failed to prove any of the statutory mitigators. *Id.* The court specifically found that Greene failed to prove, under § 13–703(G)(1), that his capacity to appreciate the wrongfulness of his conduct or conform his conduct to the requirements of the law was impaired. *Id.*

The court then discussed Greene's proffered nonstatutory mitigating circumstances. The court first addressed Greene's drug use and withdrawal, recounting Greene's testimony that he used methamphetamine regularly in the days leading up to the murder, eating very little and not sleeping. *Id.* at 442, 967 P.2d at 117. The court noted, however, that Greene testified he was not under the influence of methamphetamine at the time he killed Johnson. *Id.* The court continued:

> Nor was there expert testimony of any causal connection between drug use or withdrawal and the offense. *See State v. Rienhardt*, 190 Ariz. 579, 592, 951 P.2d 454, 467 (1997) (rejecting history of substance abuse as a mitigating circumstance when no evidence establishes a causal connection between the drug abuse and the crime). While it is true that Greene killed to get money to buy drugs, this is not the sort of causal connection that would support a claim of mitigation. To hold that a motivation to kill fueled in part by a desire for drugs is mitigating would be anomalous indeed. We reject this claimed mitigating circumstance.

*Id.*

The court next addressed Greene's dysfunctional family history. The court noted that Greene's parents separated when he was thirteen. *Id.* He then lived with his father, a

---

[18] After the murder, Greene told Bevan he had "clubbed" a "faggot." *Greene*, 192 Ariz. at 440, 967 F.2d at 115. After his arrest, Greene wrote a letter stating that he was "the 'wrong white boy' to be picked up by a 'faggot' who ended up with 'his fuckin' skull caved in.'" *Id.* He wrote other letters emphasizing that he was a "convicted murderer" who was writing from "death row alley." *Id.* at 441, 967 P.2d at 116.

- 43 -

trapper who migrated between Arizona and Washington. *Id.* He received little formal education during this period. *Id.* He later returned to Washington to live with his mother. *Id.* She was a partier whose use of drugs and alcohol contributed to Greene's own problems with methamphetamine. *Id.* The court then explained:

> This court has held that "family background may be a substantial mitigating circumstance when it is shown to have some connection with the defendant's offense-related conduct." *State v. Towery,* 186 Ariz. 168, 189, 920 P.2d 290, 311 (1996), *cert. denied,* 519 U.S. 1128, 117 S.Ct. 985, 136 L.Ed.2d 867 (1997). Greene's mother introduced him to methamphetamine, and encouraged, or at least failed to discourage, his use through her own open and flagrant use. But because adults have personal responsibility for their actions, adult offenders have a difficult burden of proving a connection between family background and offense-related conduct. At the time of the murder, Greene was 29 years old; he had had little or no contact with his mother in years. Greene's mother may have introduced him to drugs, but Greene failed to show how this influenced his behavior on the night of the murder. Thus, we do not find Greene's dysfunctional family history to be a mitigating circumstance.

*Id.* (citations omitted).

The court next examined Greene's lack of a felony record, finding it was a mitigating circumstance but "entitled to little weight," and his educational achievements, which were "slightly mitigating." *Id.* at 442–43, 967 P.2d at 117–18. The court rejected as mitigating circumstances Greene's claim to have been a good family member and a productive member of society. *Id.* at 443, 967 P.2d at 118. The court found that Greene's positive influence on his step-brother was "a single good deed, removed in time from the crime" and therefore was not mitigating. *Id.* The court also found that the effect of Greene's execution on the emotional well-being of his children had "some mitigating weight." *Id.* Greene's purported remorsefulness was belied by the record and his capacity for rehabilitation was likewise unsupported so the court rejected both as mitigating circumstances. *Id.*

Independently weighing the mitigating circumstances against the sole remaining aggravator—the "very strong" pecuniary gain factor—the Arizona Supreme Court concluded that "the mitigation, considered individually and collectively, is not sufficiently substantial to warrant leniency." *Id.* at 444, 967 P.2d at 119.

1

### C.     Analysis

Greene alleged an *Eddings* error in Claim 6(C) of his amended habeas petition. (Doc. 82-5 at 117.) The parties disagree about whether this claim was exhausted in state court. Respondents argue that Greene procedurally defaulted the claim by failing to raise it in a motion for reconsideration after the Arizona Supreme Court affirmed his death sentence on direct appeal. (Doc. 135 at 10.) Greene argues that the claim was exhausted by the Arizona Supreme Court's independent review of his death sentence. (Doc. 132 at 3–4.) The Court agrees. At the time of Greene's sentence, the Arizona Supreme Court independently reviewed each death sentence to determine the presence or absence of aggravating and mitigating factors and the weight to which the factors were entitled. *See State v. Gretzler,* 135 Ariz. 42, 54, 659 P.2d 1, 13 (1983). That review was sufficient to exhaust Greene's *Eddings* claim. *See McKinney v. Ryan*, No. CV 03-774-PHX-DGC, 2009 WL 2432738, at *19 (D. Ariz. Aug. 10, 2009) (finding petitioner's claim that the trial court failed to "properly consider" his mitigating evidence was exhausted by the Arizona Supreme Court's independent review of his death sentence); *see also Djerf v. Schriro*, No. CV-02-0358-PHX-JAT, 2008 WL 4446535, at *23 (D. Ariz. Sept. 30, 2008) ("While the Arizona Supreme Court's independent review does not encompass any and all alleged constitutional error at sentencing, the Court finds that it did encompass Petitioner's claim that the trial court violated the Eighth and Fourteenth Amendments by failing to consider all proffered mitigating evidence.").

In considering Greene's argument that the Arizona courts imposed an unconstitutional nexus test on his mitigating evidence, the Court looks to Ninth Circuit cases applying *McKinney*. In *Greenway v. Ryan*, 866 F.3d 1094 (9th Cir. 2017), the Ninth Circuit explained that "We said in *McKinney* that the Arizona courts had 'consistently' applied the causal-nexus test. . . . We did not say, however, that Arizona had always applied it." *Id.* at 1095 (citation omitted). In *Apelt v. Ryan*, 878 F.3d 800 (9th Cir. 2017), the court offered additional guidance. The court discussed several "critical factors" to be considered in determining whether the Arizona Supreme Court violated *Eddings* by applying a causal

nexus test in cases upholding a death sentence. *Apelt*, 878 F.3d at 839–40. These factors include whether the trial court "state[d] a factual conclusion that any of [the petitioner's] proffered mitigation failed to affect his conduct"; whether the Arizona Supreme Court "state[d] a factual conclusion that any of [the petitioner's] proffered mitigation would have influenced him not to commit the crime"; and whether the Arizona Supreme Court cited either *Ross* or *Wallace* in reviewing the mitigating evidence.[19] *Id.* at 840; *see Ramirez v. Ryan*, 937 F.3d 1230, 1250 (9th Cir. 2019), *cert. granted sub nom., Shinn v. Ramirez*, 2021 WL 195173 (Mem) (May 17, 2021) (No. 20-1009).

In Greene's case, the trial court stated only that it had "carefully considered all the facts, evidence and arguments presented in mitigation, including the defendant's background and trial testimony, the testimony of all defense witnesses, and all written material presented by the defendant." (Doc. 135-2, Ex. C at 5.) The trial court, accordingly, did not impose a causal nexus test on its consideration of Greene's mitigating evidence, and it found, for example, that Greene's drug use and withdrawal were a nonstatutory mitigating circumstance. (*Id.* at 6); *see Ramirez*, 937 F.3d at 1250 (finding that the court did not reject mitigation as "a matter of law" where "the trial court found nonstatutory mitigating factors"). The trial court, in other words, did not state a factual conclusion that Greene's proffered mitigation failed to affect his conduct. *Id.*; *see Apelt*, 878 F.3d at 840.

The Arizona Supreme Court, however, did apply a causal nexus test to Greene's mitigating evidence. In fact, Greene's case is listed in *McKinney* as an example of the court applying such a test. *McKinney*, 813 F.3d at 816. The court "rejected" as a mitigating circumstance Greene's drug use and withdrawal because no expert testimony had drawn a "causal connection between drug use or withdrawal and the offense." *Greene*, 192 Ariz. at 442, 967 P.2d at 117. The court likewise found that Greene's dysfunctional family history was not a mitigating circumstance because he failed to show how it "influenced his behavior on the night of the murder." *Id.*

---

[19] *State v. Ross*, 180 Ariz. 598, 886 P.2d 1354 (1994).

1    Having determined that an *Eddings* error occurred, the Court must next consider
2    whether the Arizona Supreme Court's application of a causal nexus test constituted
3    harmless error. *See McKinney*, 813 F.3d at 822. The question is whether the error had a
4    "substantial and injurious effect or influence" on the court's independent review. *Id.*
5    (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993)); *Greenway*, 866 F.3d at 1100.
6    If a federal habeas judge is in "grave doubt" about whether a constitutional trial error had
7    a substantial and injurious effect or influence, the error is not harmless and "the petitioner
8    must win." *Id.* (quoting *O'Neal v. McAninch*, 513 U.S. 432, 436, 445 (1995)). The "risk of
9    doubt" is "placed on the State." *Id.* (quoting *O'Neal*, 513 U.S. at 439). The Court concludes
10   that the error in Greene's case was not harmless.[20]

11   At sentencing, Greene presented substantial evidence of a dysfunctional childhood.
12   He experienced isolation and instability. Both of his parents were bad influences. His
13   mother's irresponsibility contributed to his own drug abuse and exposed him to a sexual
14   predator. He inherited his father's extremism and homophobia. Greene likewise presented
15   substantial evidence of chronic drug use, methamphetamine use in the days before the
16   murder, and methamphetamine withdrawal at the time of the murder. This evidence was
17   "central to his plea for leniency"—in fact, it constituted the whole of his plea for leniency—
18   "but the Arizona Supreme Court, as a matter of law, gave it no weight." *McKinney*, 813
19   F.3d at 823; *see Spreitz v. Ryan*, 916 F.3d 1262, 1278, 1281 (9th Cir. 2019) (holding that
20   the Arizona Supreme Court's failure "to give *any* meaning to Spreitz's longstanding
21   alcohol and substance abuse" left a "critical void in Spreitz's narrative" and was not
22   harmless error).

23   In Greene's case, the likelihood of harm from the *Eddings* error is magnified by the
24   fact that there was a single aggravating factor supporting the death sentence. In *McKinney*,
25   the Ninth Circuit found an *Eddings* error where the Arizona Supreme Court refused to give
26   weight to the petitioner's evidence of PTSD. 813 F.3d at 823. The court proceeded to find

27   _____

28   [20] Because the Court finds that the *Eddings* error was not harmless, it does not address
     Greene's argument that the harmless error standard should not apply.

1  that the error was not harmless, even in the face of three "important aggravating factors,"

2  including a prior conviction for a crime of violence, pecuniary gain, and cruelty. *Id.* The

3  court concluded that the PTSD evidence, if properly considered, "would have had a

4  substantial impact on a capital sentencer." *Id.* In *Spreitz*, the Ninth Circuit held that the

5  *Eddings* error was not harmless even where the Arizona Supreme Court found that several

6  other mitigating circumstances had been proved and the aggravating factor was especially

7  severe. 916 F.3d at 1281. In Greene's case, the Arizona Supreme Court excluded from

8  consideration as mitigating circumstances the most powerful evidence Greene offered at

9  sentencing.

10      The Arizona Supreme Court committed an *Eddings* error when it applied a causal

11  nexus test and failed to consider Greene's mitigating evidence. The error was not

12  harmless.[21]

13                      **CERTIFICATE OF APPEALABILITY**

14      Pursuant to Rule 22(b) of the Federal Rules of Appellate Procedure, a petitioner

15  cannot take an appeal unless a certificate of appealability has been issued by an appropriate

16  judicial officer. Rule 11(a) of the Rules Governing Section 2254 Cases provides that the

17  district judge must either issue or deny a certificate of appealability when it enters a final

18  order adverse to the applicant. If a certificate is issued, the court must state the specific

19  issue or issues that satisfy 28 U.S.C. § 2253(c)(2).

20      Under § 2253(c)(2), a certificate of appealability may issue only when the petitioner

21  "has made a substantial showing of the denial of a constitutional right." This showing can

22  be established by demonstrating that "reasonable jurists could debate whether (or, for that

23  matter, agree that) the petition should have been resolved in a different manner" or that the

24

---

25  [21] There is no inconsistency between this finding and the Court's determination that Greene
    failed to establish prejudice from the performance of trial counsel and PCR counsel. The

26  *Brecht* harmless error standard is lower than *Strickland*'s prejudice standard. *See Kyles v.
    Whitley*, 514 U.S. 419, 436 (1995); *Pirtle v. Morgan*, 313 F.3d 1160, 1173 n.8 (9th Cir.

27  2002) ("[H]armless error analysis under *Brecht* . . . involves a lower standard than
    *Strickland*'s standard for prejudice.").

28

1   issues were "adequate to deserve encouragement to proceed further." *Slack*, 529 U.S. at

2   484.  For procedural rulings,  a certificate of appealability will  issue  only  if  reasonable

3   jurists could debate whether the petition states a valid claim of the denial of a constitutional

4   right and whether the court's procedural ruling was correct. *Id.*

5          The Court finds that reasonable jurists could debate whether the Court correctly

6   applied *Martinez* in finding that the default of Claim 4(C)(1) was not excused.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25   …

26   …

27   …

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**CONCLUSION**

For the reasons stated above, the default of Claims 1, 4(A), 4(C)(1) and (2), and 5 is not excused under *Martinez*. The claims are barred from federal review.

The Court finds that the Arizona Supreme Court violated *Eddings* by subjecting Greene's mitigating evidence to an unconstitutional causal nexus test. The error was not harmless.

Accordingly,

**IT IS HEREBY ORDERED** that Claims 1, 4(A), 4(C)(1), 4(C)(2), and 5 are denied as procedurally defaulted and barred from federal review.

**IT IS FURTHER ORDERED** granting Greene's request to expand the record. The record is expanded to include Exhibits 1–54 (Docs. 116–118.) Greene's requests for discovery and an evidentiary hearing are denied.

**IT IS FURTHER ORDERED** that Greene's amended petition for writ of habeas corpus is granted unless the State of Arizona, within 120 days from the entry of this Judgment, initiates proceedings either to correct the constitutional error in Greene's death sentence or to vacate the sentence and impose a lesser sentence consistent with the law.

**IT IS FURTHER ORDERED** that the Clerk of Court shall enter Judgment accordingly.

**IT IS FURTHER ORDERED** that the Clerk of Court forward a courtesy copy of this Order to Tracie K. Lindeman, Clerk of the Arizona Supreme Court, 1501 W. Washington Street, Phoenix, Arizona 85007-3329.

Dated this 13th day of August, 2021.

_____
Honorable John C. Hinderaker
United States District Judge

- 50 -